Stegall, J., dissenting:
This case is not only about abortion policy -the most divisive social issue of our day-it is more elementally about the structure of our republican form of government. Which is to say, this case is about the proper conditions for just rule. At bottom, this case is about finding and drawing the sometimes elusive line between law and arbitrary exercises of power. Here we venture onto a battlefield as old as politics itself. And as we argue about the structure of government-and ultimately delineate the proper conditions for just rule-we must never forget that we are also actively engaged in ruling.
The structural idea that gave birth to Kansas as a political community, which has achieved consensus support across most of our history, is that the proper conditions for just rule are met via participatory consent to secure and promote the common welfare . Today, a majority of this court dramatically departs from this consensus. Today, we hoist our sail and navigate the ship-of-state out of its firm anchorage in the harbor-of-common-good and onto the uncertain waters of the sea-of-fundamental-values. Today we issue the most significant and far-reaching decision this court has ever made.
The majority's decision is so consequential because it fundamentally alters the structure of our government to magnify the power of the state-all while using that power to arbitrarily grant a regulatory reprieve to the judicially privileged act of abortion. In the process, the majority abandons the original public meaning of section 1 of the Kansas Constitution Bill of Rights and paints the interest in unborn life championed by millions of Kansans as rooted in an ugly prejudice. For these reasons, I dissent.
CLEARING THE UNDERBRUSH
Reading today's majority opinion is a follow-the-white-rabbit experience. One is left feeling like Alice, invited by the Queen to believe " 'as many as six impossible things before breakfast.' " Carroll, Through the Looking-Glass 100 (1899). Indeed, the story told by the majority is a strange one. In it, all the luminaries of the western legal tradition-from Sir Edward Coke and William Blackstone to Edmund Burke and Thomas Jefferson-would celebrate and enshrine a right to nearly unfettered abortion access. In this imagined world, the Liberty Bell rings every time a baby in utero loses her arm.
The experience of women in Kansas, however, is rendered as a dystopian Handmaid's Tale of oppression. According to the majority, the State of Kansas has commandeered the bodies and lives of "unwilling wom[e]n to carry out a long-term course of conduct" that will last for their entire "course of ... life." Op. at 484. The enactment of laws such as *518 S.B. 95 is described as the moral equivalent of legalized wife beating and spousal rape. Op. at 490-91. Abortion restrictions are framed as lingering vestiges of a discredited and bankrupt patriarchy, fit only for history's slag heap. The trope is as common as it is unjustified. See, e.g., Jackson Women's Health Organization v. Currier , 349 F.Supp.3d 536, 540 n.22 (S.D. Miss. 2018) (claiming a Mississippi abortion regulation reflected "the Mississippi bent on controlling women and minorities ... [t]he Mississippi that ... barred women from serving on juries ... [t]he Mississippi that ... sterilized six out of ten black women in Sunflower County ... [a]nd the Mississippi that ... was the last State to ratify the 19th Amendment."), appeal filed December 17, 2018.
The majority claims "the prevailing views justifying" these long-since-discredited misogynistic practices were "manifested in a majority" of the drafters and ratifiers of the Kansas Constitution and of the Kansas legislators who criminalized abortion in 1862. Op. at 489-90, 491-92. The majority concludes that these "discriminatory" "biases" and "paternalistic attitude[s]" "were reflected in" the abortion policies enacted at the time. Op. at 489-90, 491-92. As if the point wasn't clear, the majority reminds the reader that these benighted individuals were "all men." Op. at 474-75.
Oddly, at other points, the majority makes the contrary claim that "history does not reflect" an "antiabortion sentiment" in Kansas' early days. Op. at 489. In fact, our prejudiced early lawmakers "gave no consideration to the appropriateness of the abortion statutes." Op. at 489. Thus, "we cannot know what a majority of the legislators-much less the people in the Kansas Territory or the new state-thought about abortion." Op. at 489-90.
No matter. Whatever our founders thought or didn't think about abortion, we are certain they were bad. As a result, the majority concludes our founders' views on the Constitution they drafted and ratified and lived under for the first decades of the new State of Kansas must be "give[n] ... little weight" and are "wholly unpersuasive" when it comes to the majority's enlightened 21st century constitutional interpretation. Op. at 486-87, 489-90. In the majority's telling, today's legislators are not much better. The policy embodied in S.B. 95-that living babies not be "torn limb from limb" ( Stenberg v. Carhart , 530 U.S. 914, 958-59, 120 S.Ct. 2597, 147 L.Ed.2d 743 [2000] [Kennedy, J., dissenting] )-is likewise hopelessly "tethered to prejudices from two centuries ago." Op. at 491. That policy does not reflect true "Kansas constitutional value[s]." Op. at 491-92. Values this court is prepared to pronounce.
It is important to pause here and ask, what is really going on? For it is certainly true that sex-based discrimination and oppressive practices aimed at women are part of our history, as both a nation and a State. Such misogynistic practices, where they existed (or still exist), are truly heinous and deserving of scorn and moral condemnation, from this court as much as from society as a whole. The story of resistance to sanctioned abuses and second-class status is indeed a heroic one. A story in which Kansas and Kansas women played their own significant role. See 2 History of Woman Suffrage 229-68 (Stanton et al. eds., 1882) (documenting the trailblazing Kansas women's suffrage campaign of 1867); Caldwell, The Woman Suffrage Campaign of 1912 , 12 The Kansas Historical Quarterly 300-18 (Aug. 1943) (recounting the victorious women's suffrage campaign of 1912, where Kansas women won the right to vote 8 years before the national women's suffrage amendment).
But that story is not this one, as much as the majority wishes it were. The majority's framing of the issue before us solely as a battleground in a war on women is a ruse. Abortion restrictions are not relics of a patriarchal society-they are a longstanding feature of Kansas law. A ban on dismembering a living human being in utero is not inherently sexist and discriminatory. See Bray v. Alexandria Women's Health Clinic , 506 U.S. 263, 269, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (rejecting claim that "opposition to abortion reflects an animus against women in general").
There are women on both sides of this debate-one that involves complex considerations about the nature of life itself; the *519 contours of a just and fair society; and competing interests, each of which may have a legitimate claim on society's attention. "From reading the majority opinion, one would scarcely be aware that many women ... are pro-life and strongly support the same law the court concludes unconstitutionally discriminates against them." Planned Parenthood v. Reynolds ex rel. , 915 N.W.2d 206, 246 (Iowa 2018) (Mansfield, J., dissenting).
As the United States Supreme Court has said, equating "opposition to voluntary abortion" with "opposition to (or paternalism towards) women" is "irrational." Bray , 506 U.S. at 270, 113 S.Ct. 753. "Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class-as is evident from the fact that men and women are on both sides of the issue...." 506 U.S. at 270, 113 S.Ct. 753. By claiming to speak for all women on such a divisive issue, it is actually a majority of this court who now reenact the old story of paternalism-a government stripping away the political agency of thousands of women simply because it claims to know better.
Today's opinion does not disclose the inconvenient fact that a majority of the 41 women serving in the Kansas Legislature at the time of passage voted in favor of S.B. 95. Sen. J. 2015, p. 141; House J. 2015, p. 547-48. The majority does not grapple with the problem of sex-selection abortions and the vicious misogyny inherent in that despicable practice. See Eberstadt, The Global War Against Baby Girls , 33 The New Atlantis 3, 3 (Fall 2011) ("Over the past three decades the world has come to witness an ominous and entirely new form of gender discrimination: sex-selective feticide, implemented through the practice of surgical abortion with the assistance of ... prenatal gender determination technology. All around the world, the victims of this new practice are overwhelmingly female-in fact, almost universally female."); Gender-Biased Sex Selection , United Nations Population Fund, https://www.unfpa.org/gender-biased-sex-selection (last visited April 26, 2019) ("Today, around 126 million women are believed to be 'missing' around the world-the result of son preference and gender-biased sex selection, a form of discrimination.... The rise in sex selection is alarming as it reflects the persistent low status of women and girls."); see also United Nations Population Fund, Programme of Action of the International Conference on Population and Development 34 (20th anniversary ed. 2014) (containing resolution adopted by 179 countries that urges governments worldwide "[t]o eliminate all forms of discrimination against the girl child and the root causes of son preference, which results in harmful and unethical practices regarding female infanticide and prenatal sex selection"). The majority does not mention the fact that the more "progressive" nations in our global community tend to restrict abortion access after the first trimester. See generally Acosta et al., Abortion Legislation in Europe , The Law Library of Congress, Global Legal Research Center (January 2015).
The majority cannot even bring itself to agree with the United States Supreme Court's statement in Planned Parenthood of Southeastern PA v. Casey , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) :
"Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted." 505 U.S. at 852, 112 S.Ct. 2791.
The very language chosen by the majority to describe the act prohibited by S.B. 95-" 'instrumental disarticulation,' " " 'collapse of fetal parts,' " "fetal demise," etc. (op. at 466-67)-is designed to "name things without calling up mental pictures of them." Orwell, Politics and the English Language , in 4 The Collected Essays, Journalism, and Letters of George Orwell 127, 136 (Orwell & Angus eds., 1968). In the majority's narrative, even the word abortion is set aside in favor of the anodyne decision to "continue a pregnancy"-a *520 phrase occurring more times in the majority opinion than I can cite. Perhaps the majority finds the unsanitized facts "too brutal for most people to face." Orwell, at 136.
The majority doesn't recite the portion of S.B. 95 defining "dismemberment abortion" as:
"[W]ith the purpose of causing the death of an unborn child, knowingly dismembering a living unborn child and extracting such unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors or similar instruments that, through the convergence of two rigid levers, slice, crush or grasp a portion of the unborn child's body in order to cut or rip it off." K.S.A. 65-6742(b)(1) ; L. 2015, ch. 22, § 2.
As Justice Kennedy wrote in Stenberg , 530 U.S. at 957, 120 S.Ct. 2597 (Kennedy, J., dissenting), the "majority views the procedures from the perspective of the abortionist, rather than from the perspective of a society shocked when confronted with a new method of ending human life." Justice Kennedy went on to describe what actually happens during a D & E procedure-the very procedure at issue here. He did so "for the citizens who seek to know why laws on this subject have been enacted across the Nation." 530 U.S. at 957, 120 S.Ct. 2597 (Kennedy, J., dissenting).
The procedure "requires the abortionist to use instruments to grasp a portion (such as a foot or hand) of a developed and living fetus and drag the grasped portion out of the uterus into the vagina." 530 U.S. at 958, 120 S.Ct. 2597 (Kennedy, J., dissenting). Using the resistance "created by the opening between the uterus and vagina" the "grasped portion" is torn "away from the remainder of the body." 530 U.S. at 958, 120 S.Ct. 2597 (Kennedy, J., dissenting). "For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman." Gonzales v. Carhart , 550 U.S. 124, 135, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). The baby then "bleeds to death as it is torn limb from limb." Stenberg , 530 U.S. at 958-59, 120 S.Ct. 2597 (Kennedy, J., dissenting). The child "can survive for a time while its limbs are being torn off." 530 U.S. at 959, 120 S.Ct. 2597 (Kennedy, J., dissenting). The heartbeat can continue even "with 'extensive parts of the fetus removed.' " 530 U.S. at 959, 120 S.Ct. 2597 (Kennedy, J., dissenting). "At the conclusion of a D&E abortion ... the abortionist is left with 'a tray full of pieces.' " 530 U.S. at 959, 120 S.Ct. 2597 (Kennedy, J., dissenting).
Our Legislature heard similar testimony about the procedure-one even Justice Ruth Bader Ginsburg has called " 'brutal' " and " 'gruesome.' " Gonzales , 550 U.S. at 182, 127 S.Ct. 1610 (Ginsburg, J., dissenting) (quoting Stenberg , 530 U.S. at 946, 120 S.Ct. 2597 [Stevens, J., concurring] ). Dr. Anthony Levatino, a board-certified obstetrician gynecologist, provided an eyewitness account of one such dismemberment abortion performed on a 21-week-old fetus:
"Once you have grasped something inside, squeeze on the clamp to set the jaws and pull hard-really hard. You feel something let go and out pops a fully formed leg about 5 inches long. Reach in again and grasp whatever you can. Set the jaw and pull really hard once again and out pops an arm about the same length. Reach in again and again with that clamp and tear out the spine, intestines, heart and lungs." Hearing on S.B. 95 Before the Kansas Senate Public Health and Human Services Committee (Feb. 2, 2015) (testimony of Dr. Anthony Levatino).
None of these complexifying factors make it into the simplistic morality tale told by the majority. Why? Because by appropriating the rhetorical and moral force of the legitimate historical struggle against sex-based tyranny, the reader's attention is drawn away from the majority's jurisprudential sleight-of-hand. By the time the majority soars to new heights above the "paternalistic attitude" of the Wyandotte Convention on wings of "constitutional value[s]" leaving behind the accumulated "prejudices" of two centuries, the reader has completely forgotten the majority's earlier, boilerplate paean to the " ' "intention of the makers and adopters " ' " as the " ' "polestar" ' " of constitutional interpretation. Op. at 491-92, 470-71. Instead, the majority is in the judicial Wonderland of a "vibrating, flexing, and marching constitution"
*521 that is "often simply referred to as a 'living' constitution." State v. Riffe , 308 Kan. 103, 118, 418 P.3d 1278 (2018) (Stegall, J., concurring).
Invoking the spirit of this living constitutionalism (while avoiding its name), today's majority proceeds as follows. First, it contrives to find a "wide range of judicially enforceable [though unenumerated] rights" in section 1 of the Kansas Constitution Bill of Rights. Op. at 478. Then it divines a "natural right[ ]" to abortion. Op. at 491-92. And finally, it decides to review restrictions on that newly minted right according to one among varying levels of judicial "scrutiny" depending on its favored or disfavored classification. Op. at 492-98.
In the end, our court holds the right to an abortion is "fundamental" under the Kansas Constitution and restrictions on that right are subject to the highest, strictest level of judicial review in a system of tiered scrutiny. Op. at Syl. ¶ 15. Despite claiming to interpret section 1 of the Kansas Constitution Bill of Rights independent of the United States Constitution, the majority imposes a legal rubric that is indistinguishable from the "substantive due process" guarantees the 20th century United States Supreme Court found in the Fourteenth Amendment. See generally Conkle, Three Theories of Substantive Due Process , 85 N.C. L. Rev. 63 (2006) (summarizing 20th century substantive due process jurisprudence); Massey, The New Formalism: Requiem for Tiered Scrutiny? , 6 U. Pa. J. Const. L. 945 (2004) (tracing the development and "unwieldy" application of tiered scrutiny).
Perhaps it is apropos-though macabre-that while reviewing a prohibition against human dismemberment we have fashioned a 20th century jurisprudence of fundamental rights and tiered scrutiny into a procrustean bed upon which we now force the Kansas Constitution Bill of Rights to lie. Given this, the reader likely wonders, what does section 1 of the Kansas Constitution Bill of Rights properly mean? It is to this question that I now turn.
ORIGINAL PUBLIC MEANING
I have previously posed the question: "Is the meaning of our Constitution fixed or flexible? A great deal turns on how judges answer this question." Riffe , 308 Kan. at 118, 418 P.3d 1278 (Stegall, J., concurring). Today we see just how much can turn on the answer to this question. My commitment is to the fixed meaning of our constitutional text as it was originally understood by the people writing, reading, and ratifying that text.
"Law's meaning must be fixed if it is to be the people's bulwark against arbitrary power manifest in the vicissitudes of time. This simple idea-the rule of law-has historically been the way our free society has vigorously insisted that we will not be governed by the whims of the mere men and women who happen, at any given moment, to have their hands on governmental levers. '[W]here ... is the king of America? ... [I]n America the law is king . For as in absolute governments the king is law, so in free countries the law ought to be king; and there ought to be no other.' Paine, Common Sense 46 (1776)." 308 Kan. at 113, 418 P.3d 1278 (Stegall, J., concurring).
Original public meaning jurisprudence seeks to find the "contemporaneously expressed understanding of ratified text." Barrett, Originalism and Stare Decisis , 92 Notre Dame L. Rev. 1921, 1924 (2017) (describing the two basic claims of originalism: "First, the meaning of constitutional text is fixed at the time of its ratification. Second, the original meaning of the text controls because 'it and it alone is law.' "). Most states follow these same principles of constitutional interpretation-"by first positing the law's fixed meaning and then by looking to the public's common and ordinary understanding of the text at the time of its adoption to ascertain that meaning." Riffe , 308 Kan. at 115, 418 P.3d 1278 (Stegall, J., concurring); see Christiansen, Originalism: The Primary Canon of State Constitutional Interpretation , 15 Geo. J.L. & Pub. Pol'y 341, 344 (2017). Kansas, too, has mostly adhered to these ideas. See Solomon v. State , 303 Kan. 512, 523, 364 P.3d 536 (2015) (" ' "In ascertaining the meaning of a constitutional provision courts consider the circumstances attending its adoption and what appears to have been the understanding of the people *522 when they adopted it." ' "); State ex rel. Frizzell v. Highwood Service, Inc. , 205 Kan. 821, 825-26, 473 P.2d 97 (1970) ("ascertaining the meaning of constitutional provisions" requires courts to consider the "understanding of the people at their adoption"); State ex rel. Anderson v. Fadely , 180 Kan. 652, 659, 308 P.2d 537 (1957) ("the test is ... the common understanding ... of the people at the time they adopted the constitutional provision and the presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who adopted them").
I have previously noted, as well, the need for judicial humility-"attendant as it is to the indeterminacy of language and the difficulties of the interpretive process," Riffe , 308 Kan. at 117, 418 P.3d 1278 (Stegall, J., concurring)-as a third leg of the originalist stool:
"Even with these principles of constitutional interpretation firmly in hand, the conscientious judge will understand that all texts, even those 'penned with the greatest technical skill' are 'more or less obscure ... until their meaning be liquidated and ascertained by a series of particular discussions and adjudications.' James Madison, The Federalist No. 37, p. 229 (Modern Library ed. 1969). Madison went on to articulate what every judge involved in constitutional interpretation learns from experience-that the 'complexity of objects' served by the constitutional text and the 'imperfection of the human faculties' leads often to 'fresh embarrassment[s]' in any interpretive endeavor. The Federalist No. 37, p. 229. Even the commands of the 'Almighty himself,' Madison wryly notes, are 'rendered dim and doubtful by the cloudy medium through which [they are] communicated.' The Federalist No. 37, p. 230." 308 Kan. at 116-17, 418 P.3d 1278 (Stegall, J., concurring).
One of the most powerful criticisms of originalist methods takes the form of the so-called "dead hand" problem. See, e.g., Polsby, Introduction to Panel I: Originalism and the Dead Hand , 19 Harv. J.L. & Pub. Pol'y 243, 243 (1996) ("Why should the thoughts and philosophies of those who have gone before us be considered authoritative in present day life?"). Often, it is claimed, originalist outcomes will-either wittingly or unwittingly-import the repugnant racist or sexist views some of our forebearers held into modern constitutional law. Modern judges, these critics suggest, should not be required to repeat the sins of the past. For example, one prominent critic of originalism (and "strong supporter of abortion rights," Segall, Beware a Gay Rights Backlash , Los Angeles Times [May 15, 2012], at A13) has candidly stated:
"The hypothetical 'objective meaning' of much of the constitutional text at the time of ratification if looked at fairly runs directly though the racist and sexist values, perspectives, and actions of the people living at the time. For example, there can be little debate that a woman's choice to terminate her pregnancy was not part of the original public meaning of the word liberty in the Fourteenth Amendment. But many, perhaps most, of the men who wrote, voted for, and understood what liberty meant in 1868, believed women didn't have the right to vote or have substantial legal identities separate from their husbands. Why should judges today be beholden to people living in such a sexist society?" Segall, Originalism as Faith 88-89 (2018).
These unacceptable results, it is argued, render originalism suspect at best and cruel at worst. As one erudite critic of originalism has put it, an austere originalism is unacceptable "because it is inconsistent with too much that is both settled and worthy in many areas, including free speech, religious liberty, racial discrimination, and sex discrimination." Sunstein, Five Theses on Originalism , 19 Harv. J.L. & Pub. Pol'y 311, 312 (1996). As such, strict originalist methods will result "in an unacceptably narrow set of liberties for the United States in the [modern era]." 19 Harv. J.L. & Pub. Pol'y at 312. Or more bluntly, as another scholar recently put it, "Originalism has a difficult relationship with race and gender." Mulligan, Diverse Originalism , 21 U. Pa. J. Const. L. 379, 379 (2018).
Thus, a straightforward critique of originalist methods claims that originalist jurists *523 are bound to perpetuate the political disenfranchisement of minorities that prevailed during the founding era. Therefore, they claim originalism fails "to advance the interests or reach the preferred outcomes of women and people of color." 21 U. Pa. J. Const. L. at 383. Such difficulties lead naturally to the question of "whether originalism can address its relationship with race and gender while maintaining its commitment to the fixation principle-the principle that a constitutional provision's meaning was fixed at the time of its adoption." 21 U. Pa. J. Const. L. at 381. This question presents a serious challenge that ought to be taken seriously by committed originalists.
For example, the use of the word "men" in section 1 presents a kind of "dead hand" challenge to my preferred originalist approach to the Kansas Constitution. Did our founders mean to exclude women from the promises made in section 1 ? And if they did, how can we justify enforcing the original meaning of section 1 ? At oral argument, the State had some difficulty contending with this question, falling back on the notion that perhaps the use of the word "men" in section 1 was merely a "historical accident."
But substantial effort has been made to demonstrate that the unacceptable results critique-especially as it relates to issues concerning race and gender-is premised on the false assumption that originalism necessarily produces unjust outcomes. See generally McConnell, Originalism and the Desegregation Decisions , 81 Va. L. Rev. 947 (1995) (defending Brown v. Board of Education , 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 [1954], on originalist grounds); Upham, Interracial Marriage and the Original Understanding of the Privileges or Immunities Clause , 42 Hastings Const. L.Q. 213 (2015) (defending Loving v. Virginia , 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 [1967], on originalist grounds); Barnett, Was Slavery Unconstitutional Before the Thirteenth Amendment?: Lysander Spooner's Theory of Interpretation , 28 Pac. L.J. 977 (1997) (presenting an originalist argument that slavery was unconstitutional even before the adoption of the Thirteenth Amendment). In my view, these scholars, and others doing similar work, have the better argument.
In the same way, the historical case that those who drafted and ratified the Kansas Constitution understood section 1 to apply only to men is dubious. Even going all the way back to the Declaration itself, the use of the term "men" in the phrase "all men are created equal" was understood as a generic term for all humankind. See Van Patten, The Enigma of the ERA , 30 S.D. L. Rev. 8, 9 (1984) ("Did Jefferson mean 'men' in the specific sense or did he mean the word to be understood in the broader sense of 'people'? It was, of course, the style of the time to use the word 'men' in both senses.... It appears ... that the statement of equality in the Declaration is a statement about the natural equality of all people."). Contemporary dictionaries corroborate this understanding. An American Dictionary of the English Language published in 1841 defines "men" as, "Persons; people; mankind; in an indefinite sense." An American Dictionary of the English Language 525 (1841).
Accordingly, Justice Clarence Thomas has said:
"What Jefferson meant, like John Locke before him, is that all men and women, all human beings, are equally created by God, endowed with the capacity to reason and with free will, thus sufficiently sharing in human nature as to render it unjust for any man to rule another without consent. This principle of equality is applicable to all men and women at all times, and applies as much to the greatest king as to the lowest laborer." Thomas, Associate Justice, U.S. Supreme Court, Remarks at the Dwight D. Opperman Lecture (Sept. 24, 1999): Why Federalism Matters , in 48 Drake L. Rev. 231, 232 (2000).
Even Susan B. Anthony described Jefferson's famous language as containing no "exclusion of any class" and pronouncing "the rights of all men, and 'consequently,' ... 'of all women.' " 2 History of Woman Suffrage, at 631. If there was any lingering question about the generic use of the term "men" in section 1 referring to all people, it would be put to rest by Samuel A. Kingman's statement on the floor of the Wyandotte Constitutional *524 Convention, addressing this very question : "Such rights as are natural are now enjoyed as fully by women as men." Proceedings and Debates of the Kansas Constitutional Convention (Drapier ed., 1859), reprinted in Kansas Constitutional Convention 169 (1920) (hereinafter Convention). Whatever else Kingman may have thought about a woman's role in society, he believed section 1 applied to women. So did the vast majority of those who adopted and ratified the Kansas Constitution. On this point, the majority and I agree.
The majority frames the rest of its section 1 analysis as an effort to finally deliver on the Constitution's promises to women-promises that now include a right to an abortion. Op. at 484 (claiming that "society's attitude regarding women at the time was not in step with the natural rights guarantee in section 1"). It is here, in my view, that the majority must by necessity embrace a living, evolving constitution instead of treating the "law as an ever-fixed mark." Riffe , 308 Kan. at 117, 418 P.3d 1278 (Stegall, J., concurring). "As times change, the thinking goes, so too must our interpretation of the law." 308 Kan. at 117, 418 P.3d 1278 (Stegall, J., concurring). As the meaning of the text evolves "to reflect vacillating social sensibilities, the Constitution becomes a kind of mood ring for the zeitgeist of the age" giving "judges the power to announce the new colors of the constitutional text whenever the kaleidoscope of history turns." 308 Kan. at 117-18, 418 P.3d 1278 (Stegall, J., concurring).
I reject the view of our organic law adopted by the majority. Though admittedly, the majority can find support for its approach in our caselaw. See State ex rel. Donaldson v. Hines , 163 Kan. 300, 301, 182 P.2d 865 (1947) ("the constitution must be given flexibility so that it may vibrate in tune with the vicissitudes of time"); Markham v. Cornell , 136 Kan. 884, 891, 18 P.2d 158 (1933) (The constitution should "march abreast of the times," and the constitutional text "must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress."); Postlethwaite v. Edson , 102 Kan. 619, 643, 171 P. 769 (1918) (Porter, J., dissenting) ("constitutions march, aided by judicial interpretation").
"The brief of reason, liberty, and experience argues forcefully in favor of a fixed meaning. The opposing brief of hubris, progress, and good intentions holds forth the enticing fruit of 'flexibility.' " 308 Kan. at 118, 418 P.3d 1278 (Stegall, J., concurring). But "we should resist the temptation" because the "problem with judges striving to pick up on vibrations emanating from a constitutional text as it yields to the march of progress is that the process tends to produce results we 'just can't explain.' Brian Wilson, Good Vibrations , on SMiLE (Nonesuch Records 2004)." 308 Kan. at 118, 418 P.3d 1278 (Stegall, J., concurring).
LIMITING THE POLICE POWER
Today's decision is a textbook case of unexplainable results. To be sure, the majority attempts a rational explanation. To no avail. The majority misunderstands and misuses history; bolsters its rejection of Kansas law with factually unsupported allegations of prejudice; ignores even its own claim to be pursuing the "drafters' intent" as the " ' "polestar" ' " of constitutional interpretation (op. at 470-71); and in the end, can do no better than to fall back on federal substantive due process jurisprudence-complete with judicially favored rights and a byzantine system of tiered scrutiny. We thus vindicate Justice Sandra Day O'Connor's warning "that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion." Thornburgh v. American Coll. of Obst. & Gyn. , 476 U.S. 747, 814, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (O'Connor, J., dissenting).
This "major distortion in [our] constitutional jurisprudence" can at least be shown for what it is. 476 U.S. at 814, 106 S.Ct. 2169 (O'Connor, J., dissenting). In this section, I will provide some historical corrections, investigate and describe the original public meaning of section 1 of the Kansas Constitution Bill of Rights as a limit on the police power of the state, and review the applicable judicial test for evaluating alleged violations of that limit.
*525 1. From Locke to Jefferson
The majority recognizes the influence of John Locke on the Declaration of Independence and thus, on section 1 of our Bill of Rights. Tracing the language of section 1 all the way back to Locke's Second Treatise, the majority discovers a line that says "every Man has a Property in his own Person ." Op. at 480; Locke, Two Treatises of Government, Bk. II, § 27 (Gryphon special ed. 1994) (1698). This lonely line then becomes the springboard to a fundamental-nay absolute-right to abortion. Connecting these dots is difficult, to say the least. But it begins with the premise that Locke's Treatise announced a 21st-century-style list of fundamental rights. The premise is not just wrong, it is utterly foreign to Locke.
That said, it is true that Locke is amenable to an interpretive gloss that emphasizes a voluntarist understanding of the "heart of liberty" and its "right to define" its own "concept of existence, of meaning, of the universe, and of the mystery of human life." Casey , 505 U.S. at 851, 112 S.Ct. 2791. Call this the "voluntarist lens." This is the lens through which the majority reads Locke, and hence section 1 :
"At the heart of a natural rights philosophy is the principle that individuals should be free to make choices about how to conduct their own lives, or, in other words, to exercise personal autonomy. Few decisions impact our lives more than those about issues that affect one's physical health, family formation, and family life. We conclude that this right to personal autonomy is firmly embedded within section 1's natural rights guarantee and its included concepts of liberty and the pursuit of happiness." Op. at 483.
As one scholar has summarized, seeing the world through the voluntarist lens dictates that the purpose of the social compact is to "increase our personal liberty by eliminating customs and even laws that can be thought to limit individual freedom." Deneen, Why Liberalism Failed 49 (2018). This "ideal of liberty can be realized only through a powerful state" whose main role "becomes the active liberation of individuals from any limiting conditions." Deneen, at 49. In this sense, many of Locke's modern, voluntarist interpreters suggest the ultimate goal of the Lockean state is to disembed and disassociate the individual from the political community itself-freeing persons from any and every unchosen condition of life. The purpose of the state is not to secure and promote a common good but is instead to relentlessly tear down all barriers to the choose-your-own-adventurism of a voluntarist paradise.
But as I will demonstrate, the dominant and accepted jurisprudential view of the Lockean natural rights tradition during the first century-and-a-half of our existence as a nation-and for our entire existence as a state-has focused on the idea of a limited central power chartered by consent to secure and promote a "commonwealth." Call this the "commonwealth lens." In this view, Locke's primary, overriding theoretical concern is sovereignty: What is it, where does it come from, and what are the conditions for its just exercise?
By focusing on the proper conditions for just rule (the exercise of sovereignty) rather than on a voluntarist theory of "rights," this approach has striven, imperfectly to be sure, to protect both a sphere of individually retained, pre-political freedom (the negative liberty from tyranny) and a sphere of collectively held, political freedom to self-rule (the positive liberty toward citizenship). The latter is the kind of freedom that adheres to and arises out of the duties, obligations, privileges, and affections that flow from participation in a just and well-ordered political community.
Given these radically different lenses through which one may view the history and thinkers at issue, a short review of the Lockean "natural rights" tradition-a tradition far broader than Locke himself-animating the Declaration of Independence is in order. As mentioned, Locke was less interested in delineating "rights" than he was in describing the contours of republican self-government. He begins his Second Treatise by describing people in their pre-political state-that is, before they agree to associate in a political community. In that pre-political state-Locke's "State of Nature"-all people are in a "State of perfect Freedom to order their *526 Actions, and dispose of their Possessions, and Persons as they think fit, within the bounds of the Law of Nature, without asking leave, or depending upon the Will of any other Man." Two Treatises, Bk. II, § 4. This includes the "Freedom from Absolute, Arbitrary Power." Two Treatises, Bk. II, § 23. People in the State of Nature are governed by the Law of Nature: "That being all equal and independent, no one ought to harm another in his Life, Health, Liberty or Possessions...." Two Treatises, Bk. II, § 6.
But Locke sees a problem. Individuals in the State of Nature are left to their own devices to enforce the Law of Nature themselves. Two Treatises, Bk. II, §§ 6, 13. Thus, the State of Nature is prone to "Confusion and Disorder" as the powerful naturally prey upon the weak and even the enforcement of legitimate interests will be tainted with partiality and revenge. Two Treatises, Bk. II, § 13. People remain in the State of Nature "till by their own Consents they make themselves Members of some Politick Society," one that promotes the common good and "the mutual Preservation of their Lives, Liberties and Estates." Two Treatises, Bk. II, §§ 15, 123.
The power of the "Politick Society" extends only so far as the people's consent. This is because governmental power originates from the "mutual Consent of those who make up the Community," which Locke calls the "Compact." Two Treatises, Bk. II, §§ 97, 171. In this compact, the people agree to give up some of their pre-political sovereignty to a central power-surrendering some natural rights-but only to the extent necessary to secure a common good. Two Treatises, Bk. II, §§ 131, 171. People in a social compact can be presumed to have consented to rational laws that promote or secure the common good:
"[Y]et it being only with an intention in every one the better to preserve himself his Liberty and Property; (For no rational Creature can be supposed to change his condition with an intention to be worse) the power of the Society, or Legislative, constituted by them, can never be suppos'd to extend farther than the common good...." Two Treatises, Bk. II, § 131.
For Locke, legislative acts beyond the scope of this consent are illegitimate. Put simply, the Lockean understanding of republican self-rule cannot tolerate arbitrary power. Two Treatises, Bk. II, § 23.
"[W]henever the Legislators endeavor to take away, and destroy the Property of the People, or to reduce them to Slavery under Arbitrary Power, they put themselves into a state of War with the People, who are thereupon absolved from any farther Obedience.... Whensoever therefore the Legislative shall transgress this fundamental Rule of Society; and either by Ambition, Fear, Folly, or Corruption, endeavor to grasp themselves, or put into the hands of any other an Absolute Power over the Lives, Liberties, and Estates of the People: By this breach of Trust they forfeit the Power, the People had put into their hands for quite contrary ends...." Two Treatises, Bk. II, § 222.
Locke also recognized the freedom that comes with a flourishing community, what he called a "Communion of Interest," which unites the parties to a social compact in "Care and Affection." Two Treatises, Bk. II, § 77-78 (describing the more basic "first [s]ociety" between spouses and their children). Bizarrely, the majority interprets this cozy picture of the most basic "commonwealth" in human society-a family-through a voluntarist lens as a justification for finding a fundamental right to abortion. See op. at 483-84.
The influential ideas in Locke's Second Treatise permeated the revolutionary moment of 1776. But of course Locke was just one in a long line of enlightenment "natural rights" political theorists that included, among others, the Spanish Jesuit Francisco Suárez and the Dutch jurist Hugo Grotius-all of whom influenced Thomas Jefferson and the other intellectuals behind the American break with Great Britain. It was "[a] central feature of Suárez' thought on rights and political theory," for example, "that ruling power was brought into being, not by patriarchy or divine right or the supposed superiority of some person or class, but by the will and consent of free right-bearing individuals who entered into a compact with one another *527 to form a political society." Tierney, The Idea of Natural Rights 311 (1997).
Tierney helpfully traces the history of this "developing tradition of thought" that sought to harmonize "state sovereignty" with "individual natural rights." Tierney, at 289. Thinkers like Grotius reasoned deeply about "the relationship between individuals and community within a civil society." Tierney, at 334. "In this way of thinking, the natural sociability of humans led to the formation of political societies with sovereign governments; but the sociability itself was related to the needs of individual persons." Tierney, at 289. Some theorists believed that "political society was created in the first place by the voluntary acts of free individuals and that some of the rights that existed in pre-political society were not and could not be yielded to a sovereign community or a sovereign ruler." Tierney, 289. Thus, they were "able to hold together, in coherent structures of thought, ideas that later thinkers would sometimes treat as polar opposites." Tierney, at 334. In the end, "modern constitutional thought evolved in the way it did partly because the practice of monarchial absolutism could not easily be reconciled with a theory of the state expressed in the language of natural rights." Tierney, at 289.
The concepts developed within this tradition functioned for the American revolutionaries not only as a justification for their declaration of independence, but also as the foundation of a new republican structure of government. As John Hancock explained in a letter to the colonies on July 6, 1776, the Declaration of Independence was "the ground and foundation of a future Government." Hancock, Letter to the New York Convention July 6, 1776 , in 1 American Archives, Fifth Series: A Documentary History of the United States of America 33 (Force ed., 1848). "It was an act of original, inherent sovereignty by the people themselves, resulting from their right to change the form of government, and to institute a new government, whenever necessary for their safety and happiness." 1 Story, Commentaries on the Constitution of the United States 198 (1833).
The Declaration of Independence was in good company. The Virginia Declaration of Rights of 1776-which some believe was Jefferson's model for the Declaration of Independence-was the first of many state constitutions to incorporate this structure:
"That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." Va. Const. Bill of Rights, art. I, § 1.
See Calabresi & Vickery, On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees , 93 Tex. L. Rev. 1299, 1313-19 (2015). About a year before he drafted the Virginia Declaration of Rights, George Mason explained this republican theory of government in greater depth:
"We came equals into this world, and equals shall we go out of it. All men are by nature born equally free and independent. To protect the weaker from the injuries and insults of the stronger were societies first formed; when men entered into compacts to give up some of their natural rights, that by union and mutual assistance they might secure the rest; but they gave up no more than the nature of the thing required. Every society, all government, and every kind of civil compact therefore, is or ought to be, calculated for the general good and safety of the community. Every power, every authority vested in particular men is, or ought to be, ultimately directed to this sole end; and whenever any power or authority whatever extends further, or is of longer duration than is in its nature necessary for these purposes, it may be called government, but it is in fact oppression." 1 The Papers of George Mason 1725-1792, at 229-30 (Rutland ed., 1970).
Given all this, it is difficult to credit the majority's co-opting of Locke for the idea that there is a fundamental, natural right to terminate a pregnancy in whatever manner one chooses.
*528 But an aside:
After these forays into long-ago history, complete with jousting views of a political theory of natural rights that is separated from us by an ocean of both time and water, any reader who has persevered to this point is entitled to wonder-isn't the history of ideas more complicated than this? And how can European theorists who died long before America's founding tell us anything about whether the Kansas Constitution contains a right to abortion?
I do not wish to denigrate the proper role history can and should play in constitutional adjudication-after all, here I have offered an important historical corrective to the majority's misunderstanding of Locke. But I am sensitive to the words of Justice John Paul Stevens, who often warned that "[i]t is not the role of ... judges to be amateur historians." McDonald v. Chicago , 561 U.S. 742, 910, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Stevens, J., dissenting). Indeed, I agree with Chief Judge Posner's suggestion that "judges do not have either the leisure or the training to conduct responsible historical research or competently umpire historical controversies." Velasquez v. Frapwell , 160 F.3d 389, 393 (7th Cir. 1998), vacated in part 165 F.3d 593 (7th Cir. 1999). Though something else Justice Stevens said is likewise true: "Some appellate judges are better historians than others." Eastern Enterprises v. Apfel , 524 U.S. 498, 550, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Stevens, J., dissenting).
In the end, I recognize that while the majority opinion illustrates the maxim that "bad history can make bad law," the cautious judge will understand that even "good history can sometimes do the same." Amar, Our Forgotten Constitution: A Bicentennial Comment , 97 Yale L.J. 281, 289 (1987). Thus, I will return to safer judicial ground-the legal principles being debated at the time of our State's founding and the widely understood public meaning of the language our founders chose to enshrine in section 1 of our state Constitution.
2. The Structure of the American State: Rights First, Then Government
When George Washington wrote the cover letter from the Constitutional Convention to Congress, transmitting the proposed Constitution, he summarized the whole endeavor in starkly Lockean terms:
"Individuals entering into society must give up a share of liberty to preserve the rest. The magnitude of the sacrifice must depend as well on situation and circumstance, as on the object to be obtained. It is at all times difficult to draw with precision the line between those rights which must be surrendered, and those which may be preserved...." 1 Annals of Congress vii (Gales ed., 1834).
Washington's sentiment echoed through the ratification process as delegates explained the structure of the new government. For example, during the ratification convention in South Carolina, Robert Barnwell argued that "in the compacts which unite men into society, it always is necessary to give up a part of our natural rights to secure the remainder...." Debates, etc., in the Legislature, and in the Convention, of South Carolina , in 3 The Debates, Resolutions, and other Proceedings, in Convention, on the Adoption of the Federal Constitution 327, 363-65 (Elliot ed., 1830). Or again, during the Massachusetts ratification debates, Samuel Nasson asserted: "When I give up any of my natural rights, it is for the security of the rest." Debates and Proceedings in the Convention of the Commonwealth of Massachusetts in 1788, at 236 (1856).
According to James Madison, the European model of government called for "charters of liberty ... granted by power," but America provided a new example of "charters of power granted by liberty." Madison, Charters , in 6 The Writings of James Madison 83 (Hunt ed., 1906).
It would be hard to improve on Madison's words, but for modern ears, Professor Randy Barnett at Georgetown has distilled the classical liberal tradition from Locke to Madison down to its root idea that " 'first come rights, then comes government.' " Barnett, We the People: Each and Every One , 123 Yale L.J. 2576, 2596 (2014) ; see also Barnett, *529 Are Enumerated Constitutional Rights the Only Rights We Have? The Case of Associational Freedom , 10 Harv. J.L. & Pub. Pol'y 101, 103 (1987) ("[T]he authors of our Constitution were very much influenced by the Lockean philosophy of 'rights first-government second.' "). Indeed, there is ample evidence in the earliest United States Supreme Court caselaw that "rights first, then government" was the proper way to understand the structure of the American experiment in self-government.
For example, in Chisholm v. Georgia , 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), by a vote of 4-1, the United States Supreme Court first held that a state was required to answer a civil suit in federal courts. Georgia argued that as a sovereign state, it was not subject to a foreign jurisdiction without consent. See 2 U.S. at 424. The Court's Chisholm decision-and Justice James Wilson's written opinion in particular-was the first systematic exploration of state sovereignty under the newly ratified Constitution.
Justice Wilson began with the comment that "the term sovereign is totally unknown" to "the [C]onstitution of the United States." 2 U.S. at 454. Citing William Blackstone, Justice Wilson then summarized the commonly understood theory of sovereignty England operated under. "[I]n the case of the King, the sovereignty had a double operation. While it vested him ... with jurisdiction over others, it excluded all others from jurisdiction over him. With regard to him, there was no superior power; and consequently ... no right of jurisdiction." 2 U.S. at 458 (Wilson, J., opinion).
But Justice Wilson perceived "that another principle, very different in its nature and operations" was at work in the American understanding of republican government. 2 U.S. at 458. This principle held that "laws derived from the pure source of equality and justice must be founded on the consent of those whose obedience they require. The sovereign, when traced to his source, must be found in the man." 2 U.S. at 458 (Wilson, J., opinion). In the American republic, the "only reason ... a free man is bound by human laws, is, that he binds himself." 2 U.S. at 456 (Wilson, J., opinion). And the same principle "upon which he becomes bound by the laws" makes him "amenable to the courts of justice." 2 U.S. at 456 (Wilson, J., opinion). Because Georgia's sovereignty as a state was derived from the sovereignty of the people, the "aggregate of free men, a collection of original sovereigns," could bind the State of Georgia in the same way. 2 U.S. at 456, 458 (Wilson, J., opinion). Interestingly, the "collection of original sovereigns" got together after Chisholm and expressly unbound the states from federal court jurisdiction by passing the Eleventh Amendment.
3. The Rise of "States' Rights": Government First, Then Rights
But as the 19th century progressed and the question of slavery moved inexorably to the center of American political and legal debates, a new, competing account of the proper scope of the state's general policing power rose to prominence. Often, the argument began with a soft concession that while the federal government may be a government of limited powers, the same is not true of state governments. Highly summarized, these theorists "argued that rights were created by society, not by nature, and that the state or the legislature that spoke for it held the ultimate sovereign power to determine what rights would or would not be politically recognized." Sandefur, The Right to Earn a Living 84-85 (2010). Sometimes shorthanded as a defense of "states' rights," these judges, politicians, and legal theorists were perverting our original self-understanding of the American structure by espousing a "government first, then rights" view of things.
By the time the United States Supreme Court decided City of New York v. Miln , 36 U.S. (11 Pet.) 102, 139, 9 L.Ed. 648 (1837), this view-that the police power of the various states was absolute unless expressly constrained by some constitutional provision-was so widespread that the Court declared it to be "impregnable." "[A] state has the same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation." 36 U.S. at 139. Thus, "it is not only the right, but the ... duty of a state, to advance the safety, happiness and prosperity of its people ... by any and every act of legislation" in any manner except where the "exercise [of power] is not *530 surrendered or restrained" by a constitutional provision. 36 U.S. at 139.
Perhaps the most infamous legal expositor of the primacy of state sovereignty was Chief Justice Roger Taney, who would later apply the principle in his abominable Dred Scott v. Sandford , 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), superseded by U.S. Const. amend. XIV (1868), decision. Several years before that, however, he articulated an expansive commitment to government first, then rights. "But what are the police powers of a State?" he asked. License Cases , 46 U.S. (5 How.) 504, 583, 12 L.Ed. 256 (1847) (Taney, C.J., opinion), overruled in part by Leisy v. Hardin , 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890).
"They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates...." License Cases , 46 U.S. at 583 (Taney, C.J., opinion).
Thus, according to Taney, the "authority" of a state to make laws is "absolute ... except in so far as it has been restricted" by a constitutional pronouncement. 46 U.S. at 583 (Taney, C.J., opinion). Moreover,
"when the validity of a State law ... is drawn into question in a judicial tribunal, the authority to pass it cannot be made to depend upon the motives that may be supposed to have influenced the legislature, nor can the court inquire whether it was intended to guard the citizens of the State from pestilence and disease, or to make regulations of commerce for the interests and convenience of trade." 46 U.S. at 583 (Taney, C.J., opinion).
That is to say, states have near absolute power to legislate as they please subject only to judicial review for encroachment on a constitutionally protected right of the people. If no right or encroachment is found, courts must not question the real motives or intent of the Legislature.
This was a complete and total rejection of John Quincy Adams' widely read 1831 Fourth of July Oration. There, Adams had maintained that "the body politic is formed by a voluntary association of individuals; that it is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws, for the common good." Adams, An Oration Addressed to the Citizens of the Town of Quincy (July 4, 1831), in Adams Addresses 17 (1831). We know this, according to Adams, because the "Declaration of Independence was a social compact, by which the whole people covenanted with each citizen of the United Colonies, and each citizen with the whole people...." Adams, at 17.
Adams went on to explain that the "sovereignty" of the "States of this confederation ... is not, and never was, a sovereignty as defined by Blackstone and the English lawyers, identical with unlimited power; that sovereignty, thus defined, is in direct contradiction to the Declaration of Independence, and incompatible with the nature of our institutions...." Adams, at 35. Instead, the States are "but creatures of the people, and possess none but delegated powers...." Adams, at 35-36. Finally, in dramatic fashion, Adams intoned that it was the "hallucination of State sovereignty" that became "identified with unlimited power" that had "blasted the Confederation from its birth." Adams, at 23. Figures like Adams and Taney stood irreconcilably at odds. For them, the absolute "police powers in the states" on the one hand, and the "Lockean theory of natural rights" on the other, were, as one scholar put it, "mutually contradictory." Forte, Ideology and History , 13 Ga. L. Rev. 1501, 1508 (1979).
In 1857, the California Supreme Court succinctly summarized the contending legal theories of state sovereignty:
"Whether there is any restriction upon legislative power, irrespective of the Constitution, is a question upon which ethical *531 and political writers have differed. Many of the ancient writers have based this claim of omnipotence upon the doctrine of the absolute and sacred character of sovereignty, assuming that princes bear rule by divine right, and not by virtue of the expressed or tacit consent of the governed. Some contend that the very existence of government depends upon the supreme power being lodged in some branch of the government, from which there is no appeal, and, if laws are passed which are immoral, or violate the principles of natural justice, the subject is bound to obey them. Others contend that there are boundaries set to the exercise of the supreme sovereign power of the State, that it is limited in its exercise by the great and fundamental principles of the social compact, which is founded in consent, express or implied; that it shall be called into existence for the great ends which that compact was designed to secure, and, hence, it cannot be converted into such an unlimited power, as to defeat the end which mankind had in view, when they entered into the social compact." Billings v. Hall , 7 Cal. 1, 10 (1857).
Following Chief Justice Taney's Dred Scott opinion, the great debate quickly moved from courtrooms and legal briefs to the political battleground. On that field, Chief Justice Taney's political counterpart was Senator Stephen Douglas, who championed the Kansas-Nebraska Act of 1854. In short, the Act repealed the Missouri Compromise; enacted a policy of " 'popular sovereignty' " for the territories of Kansas and Nebraska; and thus permitted the expansion of slavery into the north. Farber, Lincoln's Constitution 8-10, 71 (2003).
But Douglas-more politically savvy than Chief Justice Taney-knew that slavery expansion had to be "freely" chosen if the Act would have any chance at success. Thus, in a deft display of tactical sophistication, Douglas framed the question in terms of self-government and popular sovereignty. See Adkins, Lincoln's Constitution Revisited , 36 N. Ky. L. Rev. 211, 225-26 (2009). If the people of Nebraska and Kansas wanted slavery, they could have it. Who could oppose self-government? After all, self-government was the rallying cry of the American Revolution itself.
But in truth, Douglas' understanding of "self-government" was no different from Taney's. Douglas believed "the doctrine of popular sovereignty" extended only to the constituting process itself, and not beyond. Jaffa, Crisis of the House Divided 347 (50th anniversary ed. 2009). That is, behind the Kansas-Nebraska Act was the doctrine that the pre-political sovereignty of the individual is fully and completely vested in the state in and during the constituting act. Therefore, state sovereignty is absolute so long as it is not expressly limited by constitutional command. From there, the sovereign state exercising its "state's rights" may freely choose to dole some rights or privileges back to individuals or minority interests-or choose not to. Government first, then rights.
Then came Abraham Lincoln.
4. Lincoln's Fight to Renew the Declaration of Independence
In 1854, in Peoria, Illinois, Lincoln delivered perhaps the most consequential speech in American history. It was at Peoria that Lincoln formed "the foundation of his politics and principles" and "developed the mature model that would guide his principal writings for the last decade of his life." Lehrman, Lincoln at Peoria xvi, xviii (2008). His mission was to make clear to the public the competing notions of "popular sovereignty" spawned by the pressing national need to resolve the tension between slavery and the language of the Declaration; the rise of states' rights absolutism; and the passage of the Kansas-Nebraska Act. Peoria was Lincoln's refutation of Douglas' account of state sovereignty.
To do so, Lincoln expressly took up the question of political chronology-do rights come from government, or does government follow rights? Lincoln framed this as a war between the "ancient faith" of the Declaration and a "new" understanding of so-called "self-government" that would enshrine slavery. Lincoln, Speech at Peoria, Illinois (October 16, 1854), in Lehrman, Lincoln at Peoria 289, 309 (2008). He lamented that with the *532 passage of the Kansas-Nebraska Act "we have been giving up the OLD for the NEW faith." Lehrman, at 319.
It is no exaggeration to say that Lincoln became such a towering figure in American history because he was among the first to publicly recognize and forcefully repudiate the dangerous perversion of self-government pedaled by Chief Justice Taney, Senator Douglas, and the slave power. Lincoln called it the "one great argument in the support of the repeal of the Missouri Compromise"-the argument of, quoting Douglas, " 'the sacred right of government.' " Lehrman, at 308. Douglas had sarcastically chided, " '[Lincoln thinks] [t]he white people of Nebraska are good enough to govern themselves, but they are not good enough to govern a few miserable negroes!! ' " Lehrman, at 309. As repulsive and evil as Douglas' language and assumptions were, Lincoln understood it was insufficient to respond with purely moral objections to slavery, valid as those objections certainly were. Lincoln had to repudiate Douglas' perversion of the idea of popular sovereignty and articulate a more compelling account of the structure of American government. Thus, he insisted he "hate[d]" the Kansas-Nebraska Act not just "because of the monstrous injustice of slavery itself" but also "because it deprives our republican example of its just influence in the world." Lehrman, at 297.
The simple genius of Lincoln's argument lay in his recognition that underlying Douglas' jibe was a fundamental commitment to Chief Justice Taney's idea that, once constituted, the all-powerful, sovereign state can determine what rights to grant (or not grant) to any within its jurisdiction excepting only those rights expressly reserved in the constitution itself. For Douglas, government came first, and only then could government provide rights through its organic or positive laws. Lincoln found his answer to this pernicious "new faith" in the Declaration of Independence. In Peoria, he quoted:
" 'We hold these truths to be self evident: that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness. That to secure these rights, governments are instituted among men, DERIVING THEIR JUST POWERS FROM THE CONSENT OF THE GOVERNED.' " Lehrman, at 309.
"I have quoted so much," Lincoln said, "merely to show that according to our ancient faith, the just powers of governments are derived from the consent of the governed." Lehrman, at 309. Moreover, "[w]hen the white man governs himself," that is self-government; but when he "also governs another man, that is more than self-government-that is despotism." Lehrman, at 309.
Given how deeply Lincoln is imprinted on our minds, it would be easy to miss what is happening here. Lincoln found an antidote to Douglas' poisonous theory of self-government in the Declaration's language. He rejected the notion that government comes first. Instead, the Declaration asserts that individual sovereignty-the natural rights of pre-political people-predates the formation of any just government. For Lincoln, the problem was not only that Douglas excluded some people from the social compact-which both he and Chief Justice Taney clearly did. See Dred Scott , 60 U.S. at 410 (stating the words of the Declaration of Independence "would seem to embrace the whole human family" but "the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this declaration").
Lincoln understood the problem was deeper. He recognized that Chief Justice Taney and Senator Douglas were distorting the fundamental structure of republican government. For Lincoln, it was a distinction that made all the difference. Lincoln championed a government of limited power constituted when the people relinquished only a defined and limited measure of their pre-political sovereignty while retaining the rest. Douglas championed a government of nearly unlimited power constituted when the people relinquished all of their pre-political sovereignty excepting only a defined and limited measure expressly reserved. The former idea Lincoln celebrated as "the sheet anchor of American republicanism." Lehrman, at 309. The latter was to Lincoln the seedbed of tyranny and despotism. For Lincoln, the Declaration's *533 principles and Douglas' distortion of "self-government" "can not stand together ... and whoever holds to the one, must despise the other." Lehrman, at 319. Essentially, Lincoln accused Douglas of perpetrating a nasty bait-and-switch scheme-under the promise of "popular sovereignty" Douglas had cleverly substituted tyrannical and arbitrary majority rule (despotism) for the structural guarantee of the proper conditions for just rule (republican self-rule).
Indeed, Lincoln drove the point home by demonstrating how Douglas and his supporters rejected the language of the Declaration. During the Senate debate on the Kansas-Nebraska Act, Senator John Pettit of Indiana, arguing in favor of the Act, had insisted that Jefferson's words in the Declaration were a "self-evident lie." 31 Appendix to the Congressional Globe for the First Session, Thirty-third Congress: Containing Speeches, Important State Papers, Etc. 214 (Rives ed., 1854). Referring to those who supported Douglas and the Kansas-Nebraska Act as "Nebraska men," "Nebraska Senators," and "Nebraska newspaper[s]," Lincoln inveighed:
"When Pe[t]tit, in connection with his support of the Nebraska bill, called the Declaration of Independence 'a self-evident lie' he only did what consistency and candor require all other Nebraska men to do. Of the forty odd Nebraska Senators who sat present and heard him, no one rebuked him. Nor am I apprized that any Nebraska newspaper, or any Nebraska orator, in the whole nation, has ever yet rebuked him.... If it had been said in old Independence Hall, seventy-eight years ago, the very door-keeper would have throttled the man, and thrust him into the street.
"Let no one be deceived. The spirit of seventy-six and the spirit of Nebraska, are utter antagonisms; and the former is being rapidly displaced by the latter." Lehrman, at 319-20.
See Lincoln, Seventh Joint Debate at Alton, Illinois (October 15, 1858), in The Lincoln-Douglas Debates 128, 135 (Sparks ed., 1918). Lincoln's visage was etched on Rushmore that day.
Douglas' crusade for "states' rights" owed much of its theoretical oomph to the South Carolina politician, political theorist, and vehement defender of slavery, John C. Calhoun. In one famous speech, Calhoun traced the language of the Declaration back to Locke, only to repudiate Locke's ideas. He referred to Locke's idea that pre-political human beings possessed autonomy in their state of nature as a "hypothetical truism"-that is, because there is no actual state of nature, considering this hypothetical state is "of little or no practical value." Calhoun, Speech on the Oregon Bill, delivered in the Senate (June 27, 1848), in 4 The Works of John C. Calhoun 479, 509 (Crallé ed., 1883). From this, Calhoun accused Jefferson of larding up the Declaration with aspirational nonsense. As far as the celebrated first lines were concerned, Calhoun claimed "there is not a word of truth in" the whole proposition and they were "inserted in our Declaration of Independence without any necessity." Calhoun, at 507-08.
Other, more moderate opponents of the Republican Party did not go as far as Calhoun or Pettit in directly attacking the language of the Declaration. For example, during the 1856 presidential contest, Rufus Choate, a Whig congressman from Massachusetts, refused to join the Republican Party (as most Whigs had) and instead supported the Democrat James Buchanan. He explained his decision was based on his commitment to unionism-that is, he accused the Republican Party of using the " 'glittering and sounding generalities of natural right which make up the Declaration of Independence' " to foment sectionalism and disunion. Choate, Letter to the Maine Whig State Central Committee (Aug. 9, 1856), in 1 The Works of Rufus Choate with a Memoir of His Life 212, 215 (Brown ed., 1862); see, e.g., Cox Improving on Choate , White Cloud Kansas Chief (Nov. 5, 1857), at 1 (describing Rufus Choate as "[t]hat once distinguished man" who "made his memory infamous, by stigmatizing the Declaration of Independence as a 'glittering generality' ").
Despite these criticisms, Lincoln's use of the Declaration quickly caught on and was adopted in the newly formed Republican Party *534 platform. Republican National Convention, J.C. Fremont Nominated , Fremont Journal (June 20, 1856), at 3; Osawatomie Platform , The Commercial Gazette (June 4, 1859), at 2. Describing the platform, Republican Senator Henry Wilson (later Vice-President under President Grant) noted:
"We do not believe, with Mr. Calhoun, the Declaration of Independence to be a 'rhetorical flourish.' We do not believe it to be what Mr. Pettit pronounced it-'a self-evident lie.' We do not believe it to be ... mere 'glittering and sounding generalities of natural right.' We believe it to be a living truth...." Appendix to the Congressional Globe: Containing Speeches, Important State Papers, Laws, Etc., of Third Session, Thirty-fourth Congress 64 (Rives ed., 1857).
5. Bleeding Kansas: Two Ideas in Conflict
In 1859, President James Buchanan appointed Senator Pettit as the chief justice of the Supreme Court of the Territory of Kansas, where he served until statehood. 1 Courts and Lawyers of Indiana 257 (Monks, Esarey, and Shockley eds., 1916). In at least one case, Chief Justice Pettit discussed his understanding of state sovereignty and its relationship to organic law. The Territory of Kansas agt. William S. Reyburn , McCahon 134 Kan. (Dassler) 551 (1860). In that case, Chief Justice Pettit considered whether Congress had the power to permit the territorial legislature of Kansas to "abrogate or impair the obligation of a contract." McCahon at 142. He announced his view that while the power to impair contracts was "immoral in itself, and abhorrent to every man's sense of natural justice," nevertheless, the "separate states" likely had that power initially because they were the "original sovereignties." McCahon at 142-43.
Here, Chief Justice Pettit adds theoretical flesh to the bone of his claim that the Declaration was a "self-evident lie." According to Chief Justice Pettit, the original sovereigns are not the people in their pre-political state but rather the states themselves. While Chief Justice Pettit did not articulate how he would have applied his notions of sovereignty to the constituting of the states, it seems clear that he was willing to concede a virtually unlimited power in state sovereignty. Even the power to take action that was "immoral ... and abhorrent" to every "sense of natural justice" was nearly limitless. McCahon at 143. Evidently, Chief Justice Pettit subscribed to what the California Supreme Court had described in 1857 as the "claim of [state] omnipotence" premised "upon the doctrine of the absolute and sacred character of sovereignty." Billings , 7 Cal. at 10. Though such sovereignty was tempered with Chief Justice Taney's understanding that the power of a state to make laws is "absolute ... except in so far as it has been restricted" by a constitutional pronouncement. License Cases , 46 U.S. at 583.
Thus, the anti-Declaration rhetoric of absolute state sovereignty had moved to Kansas-the hottest spot in the nascent war between the old faith in government by consent and new faith in consent by government . But Pettit's claims were not limited to the territorial supreme court. They were regularly debated publicly in the territory before statehood. See, e.g., The Democratic Creed , The Kanzas News (Nov. 7, 1857), at 2 (stating, to mock the democratic platform, "I believe the Declaration of Independence to be 'a self-evident lie' and a 'issue of glittering generalities' "). As one pro-slavery newspaper put it:
"Nor is it literally true, that 'life, liberty, and the pursuit of happiness are inalienable.' On the contrary life is taken, the pursuit of happiness is regulated, liberty is restrained from the hour of birth, to the day of death. If the abolitionists were right in their interpretation of this principle, our army should be disbanded, our navy dismantled, our prisons thrown up, our very laws blotted out; they are all practical refutations of their construction." Negro-Slavery, No Evil , Squatter Sovereign (Feb. 20, 1855), at 1.
The slave power had so internalized the "new faith" of Douglas' government-first perspective that the language of the Declaration began to make no sense at all. What about criminal laws? What about regulations? Doesn't virtually every law limit someone's liberty or pursuit of happiness? If one completely *535 rejects the Lockean social compact as a pre-constitutional event-which Douglas had done-then the Declaration did seem to "blot out" almost all positive laws enacted by the State.
Following the election of the proslavery "bogus legislature" in 1855, the free-staters elected their own legislature and began drafting what would become known as the Topeka Constitution. Etcheson, The Goose Question: The Proslavery Party in Territorial Kansas and the "Crisis in Law and Order," in Bleeding Kansas, Bleeding Missouri: The Long Civil War on the Border 47, 54 (Earle & Mutti-Burke eds., 2013). Its preamble stated: "[I]n order to secure to ourselves and our posterity the enjoyment of all the rights of life, liberty and property, and the free pursuit of happiness, do mutually agree with each other, to form ourselves into a free and independent State...." Topeka Const. of 1855, Preamble. Section 1 of its Bill of Rights stated: "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Topeka Const. Bill of Rights, art. I, § 1.
Ultimately, the United States Senate rejected Kansas' admission to the Union under the Topeka Constitution, suggesting it was not actually the product of popular sovereignty. Kansas's War: The Civil War in Documents 23 (Ponce ed., 2011) ("On July 3, 1856, the Republican-controlled House of Representatives voted to accept the Topeka Constitution and admit Kansas to the Union. The Senate, however, rejected Kansas's admission because the constitution was written by a minority of residents acting without proper authority."). The language of the Declaration was front and center of the fiery Senate debate. Senator Charles Sumner gave his sensationally vehement speech, "The Crime Against Kansas," accusing Congress of tyrannically depriving Kansans of their rights and forcing slavery upon them. He lambasted his colleagues, saying, "Are you for the protection of American citizens?-I show you how their dearest rights have been cloven down, while a tyrannical usurpation has sought to install itself on their very necks!" Sumner, The Crime Against Kansas, Speech of Hon. Charles Sumner in the Senate of the United States May 19 and 20, 1856, at 5 (1856). He continued:
"I plant [the case to admit Kansas] firmly on the fundamental principle of American Institutions, as embodied in the Declaration of Independence, by which Government is recognized as deriving its just powers only from the consent of the governed , who may alter or abolish it when it becomes destructive of their rights. In the debate on the Nebraska Bill, at the overthrow of the Prohibition of Slavery, the Declaration of Independence was denounced as a 'self-evident lie.' It is only by a similar audacity that the fundamental principle which sustains the proceedings in Kansas can be assailed. Nay, more: you must disown the Declaration of Independence...." Sumner, at 79.
Here again, it is evident that while the future of slavery in America was at stake, so too was a particular understanding of self-government-an understanding grounded in the presumption that the power of government flows from a limited consent of the people to relinquish only a measure of their natural, pre-political rights. The abolitionists, following Lincoln's lead, insisted that the proslavery forces, motivated by their "depraved longing for a new slave State," were adding to their crimes by tossing overboard the old republican commitment to limited government-"all for the sake of political power." Sumner, at 5. And this new, government-first notion of "self-government" was threatening to establish a strong foothold in the Kansas territory.
6. Constituting Kansas
These happenings weren't history to either the people of the Kansas territory or to the men who convened in Wyandotte in 1859 to draft a new constitution establishing the hoped-for State of Kansas. These were current events. The Lincoln-Douglas debates were widely discussed in the Kansas frontier newspapers. See, e.g., The Last of it-Joint Debate , The Kansas News (Nov. 13, 1858), at 2. The concepts were actively debated in *536 community forums, dueling editorials, and by blistering political invective. See Only the Beginning of the Battle , The Kansas News (Nov. 27, 1858), at 3 (describing Douglas' Illinois campaign and calling on Republicans to fight for "life, liberty and the pursuit of happiness"); Men Who Do and a Man Who Don't Care Whether Slavery is Voted Up or Down , White Cloud Kansas Chief (September 20, 1860), at 1 (contrasting Douglas' view with the guarantees of the Declaration of Independence); The Administration of Abraham Lincoln , The Commercial Gazette (Oct. 13, 1860), at 2 (predicting Lincoln would win the presidential election and restore "the principles promulgated in the Declaration of Independence," including that "governments are instituted among men deriving their just powers from the consent of the governed").
By the late 1850s, the public conversation in Kansas was so thoroughly steeped in these competing ideas that certain phrases and slogans became flags that could be hoisted to immediately declare which side one was on. The organizational meetings in the town of Hyatt, Kansas, are illustrative. In 1857, free-state advocates-self-declared "citizens of the United States, inhabitants of Kansas and settlers of the town of Hyatt"-invoked the Lockean language of the Declaration of Independence to establish their own social compact. Town Organization of Hyatt, Kansas, Kansas Historical Society; see People's Movement at Hyatt , The Kanzas News (June 20, 1857), at 2. They asserted: "As the only 'divine right' of governing, emanates from the people, it follows that the sovereignty of the individual is first, the sovereignty of communities next, the sovereignty of associated communities or States, third, and the sovereignty of a union of States is last and least." Town Organization of Hyatt. Moreover, they were organizing the town of Hyatt because the "citizens of the town of Hyatt, being without any government of an operative character, and without officers or organization, are necessarily thrown back upon that individual sovereignty...." Town Organization of Hyatt. Put another way, these original sovereigns sought to purchase a miniature commonwealth of their own at the cost of relinquishing a limited measure of their pre-political sovereignty.
By 1859, free-staters had gained the upper hand. At the new constitutional convention in Wyandotte that summer, it was clear the language of the Declaration was to play a starring role in the new Kansas Constitution. As first introduced, section 1 of the Bill of Rights read:
" 'All men are by nature equally free and independent, and have certain inalienable rights, among which are those of enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and of seeking and obtaining happiness and safety, and the right of all men to the control of their persons, exists prior to law and is inalienable.' " Convention, at 271.
Explaining its rationale, the committee on the Preamble and Bill of Rights claimed that the Declaration-and this language in particular-was where "people [first] cut loose from a narrow conception of humanity, and entered upon that broad field of human liberty." Convention, at 184. The language was described in explicitly structural terms-as "the timbers of the building" and "the superstructure upon which the edifice of State must be erected." Convention, at 185. The importance of understanding section 1 as a structural clause cannot be missed. The delegates to Wyandotte understood the language of section 1 to be creating a government of structurally limited powers. To emphasize this, the committee explained: "This bill of rights starts out on the old maxim that the world is governed too much-that there is too much proscriptive law." Convention, at 185. Section 1 guaranteed that "[t]he people are here allowed to do the nearest what they like." Convention, at 185. The only way this could be true is if the language of section 1 was publicly understood to limit power rather than to grant rights .
The older European idea of liberty flowing from the power of the state was then lifted up as an example Kansas had soundly rejected:
"It is said in French history, at a certain time, that no people could assemble at the theatre, or on the street, or anywhere, without having soldiers attending them; passports were required of their citizens of *537 mornings under police regulations-pretending thus to secure liberty to the people. Even the government sent its messengers to the markets to see that the meat was in proper condition; and sent them to the stores to see that weights and measures were properly regulated.... [The people] could not cut a canal or build a railroad without looking up to their ruler for both the mode and means. With our democracy, the rulers should look to the people." Convention, at 185.
Finally, to emphasize that section 1 was understood to be a restriction on the police power of the state, the Bill of Rights was introduced with the claim that " '[t]he tyranny of the Legislature is really the danger most to be feared.' " Convention, at 186.
When the floor was opened to debate the proposed Bill of Rights, the use of the Declaration's language in section 1 caused immediate confusion and skepticism. Was the language of the Declaration true? If it wasn't true, why put it in the new constitution? In the words of one delegate, "I know, sir, that there is, at the present time ... a great disposition to look upon the Declaration of Independence as a string of 'glittering generalities.' " Convention, at 280. Would section 1-whether by its "control of their persons" clause or by its "lives and liberties" clause-mean that the state could not enforce criminal statutes?
For example, one delegate objected that "the language of this section is an enunciation of the higher law principle" and that, specifically, the " 'control of a man's person' " provision was wrong. Convention, at 272. "[F]or if this doctrine is correct, you cannot make a man amenable to any criminal law." Convention, at 272. Another delegate worried that "if there is any necessity for making qualifications ... it might be best to place them also in connection with the right to life and liberty." Convention, at 280. Yet another delegate roundly rejected the proposed language of section 1, saying: "[T]he effect of this provision is to declare, that no person can forfeit his right to liberty under any circumstances." Convention, at 274. He went on: "Adopt this declaration here, and at once you abolish the criminal law, and open all your jails. I am opposed to the declaration ... because I believe the declaration is not true in itself." Convention, at 274.
The hotly contested issue of the Declaration's truth was evident throughout the Wyandotte debates. Some were confused about the true meaning of the "unalienable rights" language of the Declaration, while others still committed to a government-first view of states' rights expressed outright hostility to the idea. It was not until George Lillie-a lawyer who had served on the Preamble and Bill of Rights Committee-rose to instruct his fellow delegates in the majestic meaning of section 1 that the confusion and opposition subsided. His brief speech is a brilliant summation of the Lockean commitment-charters of power granted by liberty rather than charters of liberty granted by power-animating both the Declaration of Independence and section 1 :
"Mr. President, ... I think this debate has taken rather an extraordinary range. It occurs to me, sir, that this is a question of natural rights, and not at all connected with artificial rights and civil disability. It is a declaration that all men are created free and equal and possessed of certain inalienable rights, such as we all concede, as set forth in the Declaration of our national independence-from which I suppose no gentleman at this hour will deliberately dissent. These are natural rights; but by this section we say that they existed prior to the formation of any government; that they are coextensive with the existence of man, and so were before the formation of civil government. When, by the multiplication of men, it became necessary to have civil government, individuals gave up part of their natural rights to secure for themselves the blessings of civil liberty, and among them were restraints upon the liberty and life of the person. Hence it became necessary that laws should be enacted to protect the weak. These natural rights were given up for the protection of the weak. Thus, every man in the State has acknowledged that he has given away part of his natural rights.... I consider this question as contemplating only natural *538 rights, and not acquired rights...." Convention, at 280.
Lillie understood-first come rights, then government. Lillie would go on to serve as a Kansas legislator, a district attorney, and a judge. Bar Resolutions , The Eureka Herald (Nov. 29, 1883), at 4. His extraordinary convention floor speech, though mostly lost to history, deserves to be remembered as one of the greatest in the history of our state.
Soon after Lillie's address, Samuel A. Kingman offered the language forever enshrined as section 1 of our Bill of Rights: " 'All men are possessed of equal and inalienable natural rights, among which are those of life, liberty and the pursuit of happiness.' " Convention, at 283. Kingman asserted that these words "are fixed in the minds of the American people" and "part of our political creed, from which no man can extricate himself" being the "political Bible of every citizen of the United States." Convention, at 283.
7. The Original Public Meaning of Section 1
The delegates at Wyandotte who voted to approve Kingman's language understood what they were doing. The citizens of Kansas who ratified the language understood its meaning. They knew they were establishing a structural constraint on the power of the government . They were not, in section 1, conferring "civil" rights on the people-that came in later provisions of the Bill of Rights. Rather, they were giving up only so much of their pre-political sovereignty as was necessary to establish a civil government-to quite literally, constitute a new state. They, in their pre-political state, represented absolute liberty granting a limited charter of power to the state.
As Kansas was bleeding its way into the Union, the warring parties were thus relitigating one of the most fundamental and perennial debates of western political systems-which come first, rights or governments? Do our individual freedoms flow from the constitution and the power of the State, or does the constitution and the power of the State flow from our freedom as individuals? This debate echoes anew through the diametrically opposed views of our Constitution my colleagues and I have announced today.
Tellingly, today's majority shares its government-first assumptions with many courts that have considered challenges to state abortion restrictions under state constitutions. After all, most modern jurisprudence on abortion regulation shares the majority's underlying assumption that the scope of the state's police power is unlimited unless expressly constrained by a constitutional provision. This explains the fierce contest to locate a specific "right to abortion" somewhere in the organic law-whether it be federal or state.
Consider the California Second District Court of Appeal's decision in People v. Gallardo , 243 P.2d 532 (Cal. Dist. Ct. App. 1952), vacated 41 Cal. 2d 57, 257 P.2d 29 (1953). In Gallardo , the California court considered whether the state's criminalization of abortion violated the " 'natural law' " right to "the care of one's corporeal tenement." 243 P.2d at 535. But, the court said, "The realm of statecraft acknowledges no such thing as 'natural law.' " 243 P.2d at 535. "[M]any men," the court mocked, have become "persuade[d] ... to believe" that "the principles embodied in the Bill of Rights are so allied to the happiness and freedom of people" that they must be "the direct gift of the Deity." 243 P.2d at 535. To which the California court emphatically responded, "Not so." 243 P.2d at 535. Rather, rights come from "[t]he state." 243 P.2d at 535.
The Gallardo court then rhapsodized about the state as "the paramount creation of man." 243 P.2d at 535. "Either through a monarch, a dictator or a legislature" the state has "the absolute control of society except to the extent abridged by its organic law." 243 P.2d at 536. Because the California court had not yet achieved the judicial creativity and flexibility of today's majority, it could find nothing in its organic law establishing a woman's right to an abortion, so the state was free to regulate in any manner it saw fit. See 243 P.2d at 537.
Even though the Gallardo court and today's majority desire different outcomes, both share a government-first understanding of the constitution arising from the belief *539 that in the act of constituting a state, the people only retained a small chunk of expressly defined sovereignty for themselves, which was carved out of an otherwise universal grant of power to the state. This starting point naturally leads present-day political actors-including judges-to view the constitution primarily as a rights-granting document. This rights-oriented understanding of the constitution only magnifies the State and its near-limitless power. For the Gallardo court, the legislature was the "monarch" with near "absolute control" to dole rights out to the people as it saw fit. 243 P.2d at 536. For today's majority, the State's power is equally broad-and the Kansas Supreme Court has a similar absolute control to creatively find and grant specific, fundamental rights, mentioned nowhere in the Constitution, as a kind of benevolent judicial preferment.
So even though results have varied dramatically, this basic assumption-government first, then rights-has become the standard framing in cases adjudicating constitutional rights. If a right cannot be "found" in some constitutional clause (or even a penumbra), then the state is free to act as it sees fit-however arbitrary its action may be. The pressure this puts on judges to be more creative and ambitious in their "search" for "fundamental rights" is largely to blame for the erosion of rigorous-and constrained-constitutional interpretation.
At least in Kansas, it does not have to be this way. Our rights-first founding was accomplished when, in the act of constituting Kansas, our founders retained for themselves all pre-political individual sovereignty except that which was relinquished as necessary to secure the political community being formed. When political actors and judges start from this understanding, the constitution becomes primarily a power-limiting document. This power-oriented understanding of the constitution magnifies the people's natural, pre-political rights. This is how our founders understood the political charter they wrote and ratified. In particular, section 1 of the Kansas Constitution Bill of Rights was intended to settle this question for the newly formed State of Kansas. In Kansas, rights come first-then government.
The winning side of the long and labored debates over Kansas' political birth believed that rights bearing, pre-political persons compacted together to give a measure of their sovereignty-no more than necessary-to their agents in the newly formed State. Those agents, in turn, were to exercise that limited measure of sovereignty to promote and secure the common good. In this way, our founders reaffirmed the republican genius of the American founding that a government of limited powers, delegated by the consent of naturally sovereign individuals to secure a common welfare (literally a commonwealth), is a better guarantee-the only real guarantee-of the full range of natural pre-political rights than is a government of unlimited power which doles certain favored rights back out to citizens. See, e.g., Charles, Restoring "Life, Liberty, and the Pursuit of Happiness" in our Constitutional Jurisprudence: An Exercise in Legal History , 20 Wm. & Mary Bill Rts. J. 457, 481-83 (2011) ("[T]he Declaration's preamble ... embodies the belief and ideal that a Republic, based solely on the equitable consent of the people, will best preserve 'life, liberty, and the pursuit of happiness.' ").
Today's proponents of a government-first view of the Kansas Constitution cannot, of course, call the language of the Declaration or section 1 a lie. But even so, the clear, original meaning of section 1 cannot be squared with their commitments. In a government-first world, a plain reading of the words simply makes no sense-if not quite a lie, they become "glittering generalities" at best. Some of our predecessors have taken that latter route. See Schaake v. Dolley , 85 Kan. 598, 601-02, 118 P. 80 (1911) (purporting to eschew the term " 'glittering generality' " as a description of section 1, but nevertheless holding that it cannot "furnish a basis for the judicial determination of specific controversies" and is more of a " 'guide[ ] to the legislative judgment' " than a " 'limitation of power' ").
The majority chooses to avoid each of these distasteful concessions by instead-in a display of staggering judicial creativity and *540 ambition-choosing to distort the original public meaning of section 1 in order to make it "fit" both a government-first perspective and a "fundamental right" to abortion. Beginning with the assumption that government has all the power-and given the desired result-the majority reads section 1 as a grant of unlimited power to judges to declare which "fundamental rights" the State cannot encroach upon. In so doing, the majority has repudiated not only the original meaning and spirit of Wyandotte, but also the consistent interpretation of that language by our predecessors.
8. Early Police Power Jurisprudence
As I have made clear, sequence is of central importance in this long-running debate about the just exercise of government power. Construing Professor Barnett's "first come rights, then comes government" formulation as a prioritization of rights over government (even if that might, sometimes be the result) would be a misunderstanding. Properly understood, the claim is about political chronology . It answers the fundamental "which came first?" chicken-and-egg problem of modern, western political theory. Does the State come first and, only then, provide protections to individual rights, or are people possessed of absolute pre-political sovereignty which they delegate-in part-to a state to secure the general welfare of the political community?
The answer given by the Declaration of Independence and section 1 of the Kansas Constitution Bill of Rights is that the people are sovereign, and the government rests on their limited delegation of power. The question then becomes: How do we know how much pre-political sovereignty the people delegated to the State and how much they retained? This question is paramount because the scope of pre-political sovereignty retained is the only proper "measure of whether government is acting" within the just and lawful scope of its general police powers. Barnett, The Proper Scope of the Police Power , 79 Notre Dame L. Rev. 429, 451 (2004).
Put the same question a little differently and you get something like this: If the only foundation on which the State may enact just laws is the voluntary consent of the governed-the "giving up" of sovereignty exercised to a central power-how do we know whether the people have "consented" in any particular instance? It turns out, this is the precise question courts have busied themselves answering over the course of a long tradition of police power jurisprudence.
In Washington's words, the "difficult" task of drawing "the line between those rights which must be surrendered, and those which may be preserved" must always "depend ... on situation and circumstance, as [well as] on the object to be obtained." 1 Annals of Congress vii (Gales ed., 1834). Justice Samuel Chase undertook one of the earliest efforts to draw this line in Calder v. Bull , 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798).
In Calder , Justice Chase first rejected the idea that the power of the state is absolute unless expressly limited by constitutional command: "I cannot subscribe to the omnipotence of a state legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the constitution...." 3 U.S. at 387-88. Next, Justice Chase tackled the Washingtonian question at hand-where exactly is the line limiting the just and proper exercise of a state legislature's police power? Heeding Washington's admonition to pay attention to the "object to be obtained," Justice Chase began with the proposition that the "purposes for which men enter into society will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it." 3 U.S. at 388. Thus, the "nature, and ends of legislative power will limit the exercise of it." 3 U.S. at 388. Generally, those ends are "to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect ... persons and property from violence." 3 U.S. at 388.
Justice Chase then turned to Washington's other admonition-to scrutinize the particular "situation and circumstance" before deciding the precise boundary of the police power. Generally speaking, Justice Chase claimed that "[a]n act of the legislature (for I cannot call it a law), contrary to the great first principles of the social compact, cannot *541 be considered a rightful exercise of legislative authority." (Emphasis added.) 3 U.S. at 388. But legislative bodies make laws to address specific concerns and courts judge particular cases. How is a court to apply "great first principles" to a specific law or in a specific case?
To answer this, Justice Chase listed specific laws that would exceed the legitimate police power, including: punishing "a citizen for an innocent action"; permitting a man to be "judge in his own cause"; and taking "property from A. and giv[ing] it to B." 3 U.S. at 388. What did all these examples have in common? Justice Chase answered this with an early version of what would become, over time, the developed and accepted judicial standard applied to questions involving the proper scope of state police power: "[I]t is against all reason and justice, for a people to intrust a legislature with such powers; and therefore, it cannot be presumed that they have done it." (Emphasis added.) 3 U.S. at 388. For Justice Chase, claiming a state legislature possessed any powers beyond those reasonably presumed to have been delegated by the people was "a political heresy, altogether inadmissible in our free republican governments." 3 U.S. at 388-89.
The proper bounds of state police power was a common subject of discussion in constitutional treatises published after the Civil War. One of the most influential was Thomas Cooley's A Treatise on the Constitutional Limitations first published in 1868. There, Cooley made the commonplace observation that "[p]olice regulations cannot be purely arbitrary nor purely for the promotion of private interests. It must appear that the general welfare is to be in some degree promoted." 2 Cooley, A Treatise on the Constitutional Limitations 1227 n.2 (8th ed. 1927). "[A] large discretion is necessarily vested in the legislature, to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests." Cooley, at 1231. Thus, "courts will not interfere" with legislative choices-or question the legislature's "wisdom or expediency"-unless "the regulations adopted are arbitrary, oppressive, or unreasonable." Cooley, at 1228; see Sutherland, Notes on the Constitution of the United States 732-33 (1904) (stating any exercise of police power "must be reasonable and extend only to such laws as are enacted in good faith for the promotion of the public good"; the police power cannot be used for the benefit or "oppression of a particular class" or to pass "unduly oppressive" or "arbitrary" laws.).
The view that there were "substantive limit[s] upon the police power of the states" was "consistent" across the constitutional commentators of the era. Larsen, Nationalism and States' Rights in Commentaries on the Constitution after the Civil War , 3 Am. J. of Legal Hist. 360, 368 (1959). "All of them expressed a fear of a tyranny of the majority" and were concerned with "protecting the vested rights [that is, pre-political rights] of all persons ... from legislative attacks upon their liberty under the guise of the police power." 3 Am. J. of Legal Hist., at 368.
9. Early Kansas Supreme Court Interpretations of Section 1
The earliest justices on this court felt the same way. For decades after statehood, this court interpreted sections 1 and 2 of the Kansas Constitution Bill of Rights as imposing a structural limit on the police power of the state. In fact, we consistently held, in no uncertain terms, that section 1 is a police power provision. In The State v. Wilson , 101 Kan. 789, 168 P. 679 (1917), this court considered whether a trading stamp tax was an unconstitutional exercise of the police power. The court stated unequivocally: "The provisions of our own constitution which are violated by the act in question, if the suppression of trading stamps is beyond the police power of the state, are the declarations of the first two sections of our bill of rights...." 101 Kan. at 795, 168 P. 679. Decades later, we affirmed the same truth, citing Wilson (among other cases) in support. See Tri-State Hotel Co. v. Londerholm , 195 Kan. 748, 759, 408 P.2d 877 (1965) ("The provisions of our Constitution which are violated by the Act, if it is beyond the police power of the state as the plaintiffs contend, are Sections 1 and 2 of our Bill of Rights.").
*542 As Wilson explained, the "judicial question" posed by section 1 is does the act under scrutiny have "a real relation to the public good? Does it tend to remove or diminish a practice that is injurious, obnoxious or inconvenient to the public?" 101 Kan. at 799, 168 P. 679 ; Carolene Products Co. v. Mohler , 152 Kan. 2, 6-7, 102 P.2d 1044 (1940) ; see Tri-State Hotel , 195 Kan. at 763, 408 P.2d 877 (asking whether the classification bore "a real, logical and substantial relation to the public welfare?"). Applying this test, the Wilson court held the trading stamp tax was a legitimate exercise of the police power because it reasonably prevented "evil consequences" to the public. 101 Kan. at 800, 168 P. 679.
In a long and settled line of cases, the Kansas Supreme Court applied these same tests to a variety of challenged legislative acts. See Brick Co. v. Perry , 69 Kan. 297, 299, 76 P. 848 (1904) (holding law that prohibited firing an employee for belonging to a labor organization was not a valid "police regulation" because it did "not affect the public welfare, health, safety or morals of the community, or prevent the commission of any offense or other manifest evil"); In re Williams , 79 Kan. 212, 221, 98 P. 777 (1908) (upholding regulation of the sale of explosive powder because " 'the police power can not be put forward as an excuse for oppressive and unjust legislation' " but " 'it may be lawfully resorted to for the purpose of preserving the public health, safety or morals, or the abatement of public nuisances' "); Wilson , 101 Kan. at 799-800, 168 P. 679 (upholding trading stamp tax as a valid exercise of the police power because it had a "real relation to the public good" and reasonably prevented "evil consequences to the public"); State v. Haining , 131 Kan. 853, 854-55, 293 P. 952 (1930) (upholding Sunday closing law as a valid exercise of the police power); Capital Gas & Electric Co. v. Boynton , 137 Kan. 717, 728, 730, 22 P.2d 958 (1933) (holding law that prohibited public utility companies from selling appliances violated the police power because it "create[d] a monopoly," did not promote the public welfare, and was "unreasonable, arbitrary, unjust and oppressive"); State v. Payne , 183 Kan. 396, 405, 327 P.2d 1071 (1958) (affirming conviction for evading alcoholic liquor tax because alcoholic liquor was " 'fraught with such contagious peril to society' " and thus subject to police power regulation); Gilbert v. Mathews , 186 Kan. 672, 686, 352 P.2d 58 (1960) (holding law requiring itinerant merchants to obtain licenses to conduct public auctions violated the police power because it "places arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business, and is designed to be so oppressive and unreasonable that it prohibits the conduct of such lawful business"); Tri-State Hotel , 195 Kan. at 761, 764, 408 P.2d 877 (upholding separate liquor licensing laws for nonprofit and for-profit clubs because alcohol consumption was "attendant with danger to the state" and the distinction between the clubs bore "a real, logical and substantial relation to the public welfare in regulating the consumption of alcoholic liquor in the state"); Laird & Company v. Cheney , 196 Kan. 675, 686, 414 P.2d 18 (1966) (following Tri-State to hold that liquor price-fixing law did not violate the police power because "the method used is reasonable and not arbitrary and ... there is a real and substantial relation to a proper legislative purpose"); Delight Wholesale Co. v. City of Overland Park , 203 Kan. 99, Syl. ¶ 5, 453 P.2d 82 (1969) (holding ordinance that prohibited selling ice cream from vehicles on city streets violated the police power because "such enterprises may be controlled by reasonable regulations" but "the absolute prohibition of such legitimate enterprises is arbitrary and unreasonable"); City of Junction City v. Mevis , 226 Kan. 526, Syl. ¶ 1, 601 P.2d 1145 (1979) (affirming the dismissal of conviction for firearm possession under overbroad ordinance that criminalized innocent conduct because "[a] city cannot enact unreasonable and oppressive legislation under the guise of the police power").
The majority tries to force cases like Wilson and Tri-State Hotel into its "fundamental rights" framework. See op. at 469-70, 477-78. But this is a critical misunderstanding of not only political philosophy, but also of the history of police power jurisprudence in this country and in Kansas. Section 1, as originally understood and historically interpreted by *543 this court, was not a fount of judicially found "fundamental" or "natural" rights. Instead, it guaranteed Kansans their first rights of republican self-rule. Namely, the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to that same common welfare, on the other. Two decisions in particular- Williams and Gilbert - show how the judicial test should be applied.
In Williams , the petitioner was convicted for selling black powder in an unlawful manner. On appeal, Williams argued the act regulating the sale of black powder violated the police power under section 1 and the Fourteenth Amendment because it singled out the coal industry for special oversight. 79 Kan. at 213-14, 98 P. 777. Our police power analysis focused on two questions: (1) whether the purpose of the act was valid, and (2) whether the means used reasonably furthered that purpose.
First, we determined the purpose of the act was "to provide for safety in the operation of coal-mines." 79 Kan. at 216, 98 P. 777. Then we explained that the distinction between coal mines and other mines would be valid if the means used reasonably furthered that purpose:
"That a law operates only upon a class does not make it invalid, if the classification is reasonable. If the classification is arbitrary or fictitious, it is objectionable, but where it is based upon such differences in situation as to be reasonable in view of the purpose to be accomplished, and tends fairly to accomplish that purpose, it must be upheld. ( Rambo v. Larrabee , 67 Kan. 634, 73 P. 915 [ (1903) ].) It is sufficient if the classification is based upon some reasonable ground-some differences which bear a just and proper relation to the attempted classification, and is not a mere arbitrary selection. ( Magoun v. Illinois Trust & Savings Bank , 170 U.S. 283, 18 Sup. Ct. 594, 42 L.Ed. 1037 [ (1898) ].)
"The coal mining industry of the state is of great and growing importance, about 12,000 men being employed in this occupation in this state. The hazards incident to this work are matters of common knowledge, and proper regulations to secure the safety of employees, so far as possible, is a matter appealing strongly to the wisdom and conscience of the legislature. Regulations to promote this beneficent end are not void because they do not relate to other industries, where, if the peril is as great, the conditions at least are different and may properly call for different regulations." 79 Kan. at 217, 98 P. 777.
Distilling the test further, the court summarized: "Speaking generally, laws may be enacted to promote the health and safety of the people, and will be upheld when they have a necessary or reasonable relation to the accomplishment of such ends." 79 Kan. at 217, 98 P. 777. In the end, the court upheld the act as a legitimate exercise of the police power under both constitutional provisions because its purpose-to promote the safety of a dangerous industry-was valid and the means used to achieve that purpose were reasonable. 79 Kan. at 216-20, 98 P. 777 ; see The State v. Reaser , 93 Kan. 628, 629-30, 145 P. 838 (1915) (following Williams to hold that a mining regulation was a valid exercise of the police power).
Later in Gilbert , we considered whether a law requiring itinerant merchants (but not local ones) to obtain licenses to conduct public auctions violated section 1's limitation on the state's police power. This public auction law was full of red tape and fees, and hindered itinerant merchants from participating in the trade. The key question was whether the law was a reasonable regulation or a protectionist roadblock.
The Gilbert court explained that the police power is first limited by the purpose of the law in question; it extends only to "the protection of the public health, safety and morals" and "the preservation and promotion of the public welfare." 186 Kan. at 676-77, 352 P.2d 58. This is because the police power
" 'springs from the obligation of the State to protect its citizens and provide for the safety and good order of society. Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of *544 self protection, and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury.' " 186 Kan. at 677, 352 P.2d 58 (quoting Panhandle Co. v. Highway Comm'n. , 294 U.S. 613, 622, 55 S.Ct. 563, 79 L.Ed. 1090 [1935] ).
But the Gilbert court refused to be a rubber stamp. Instead, it questioned the real purpose behind the public auction law and cautioned courts to watch out for the proverbial wolf of arbitrary special interest legislation masquerading as a harmless sheep of public welfare regulation. 186 Kan. at 677-79, 352 P.2d 58 ; see State ex rel. Mitchell v. Sage Stores Co. , 157 Kan. 404, 427, 141 P.2d 655 (1943) (Wedell, J., dissenting) (explaining when the "principle purpose" behind an exercise of the police power is to advantage "a particular class[,] ... courts will look behind even the declared intent of legislatures, and relieve citizens against oppressive acts where the primary purpose is not to the protection of the public health, safety, or morals"). The court held the public auction law was not a valid exercise of the police power because it was "purposely designed to completely eliminate the sale of new merchandise at public auctions by itinerant vendors." Gilbert , 186 Kan. at 679, 352 P.2d 58. As the court explained:
"While the police power is wide in its scope and gives the legislature broad power to enact laws to promote the health, morals, security and welfare of the people, and further, that a large discretion is vested in it to determine for itself what is deleterious to health, morals or is inimical to public welfare, it cannot under the guise of the police power enact unequal, unreasonable and oppressive legislation or that which is in violation of the fundamental law." 186 Kan. at 677, 352 P.2d 58.
Delight Wholesale , 203 Kan. 99, Syl. ¶ 4, 453 P.2d 82 ; Junction City , 226 Kan. at 535, 601 P.2d 1145.
The Gilbert court also declared that "[t]he reasonableness of restrictions imposed by the legislature by the exercise of the police power is a judicial matter." 186 Kan. at 678, 352 P.2d 58 ; see Delight Wholesale , 203 Kan. at 104-05, 453 P.2d 82 (" 'the reasonableness of the enactment is a question for courts to determine in the exercise of sound judicial discretion' "); Sage Stores , 157 Kan. at 421-22, 141 P.2d 655 (Wedell, J., dissenting) (stating the determination of the reasonableness of police power legislation "is the ultimate province, responsibility and duty of courts"). The court described the judicial inquiry this way:
"The controlling principle is that if legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for the government to effect, the legislature transcends the limits of its power in interfering with the rights of persons affected by the legislation, but if there is reasonable relation to an object within governmental authority, the exercise of the legislative discretion is not subject to judicial review." Gilbert , 186 Kan. at 678, 352 P.2d 58.
See Tri-State , 195 Kan. at 760, 408 P.2d 877 (citing Gilbert for the rule: "If the classification provided is arbitrary, as the plaintiffs contend, and has no reasonable relation to objects sought to be attained, the legislature transcended the limits of its power in interfering with the rights of persons affected by the Act.").
Applying this test, the Gilbert court held the licensing regulations were "poorly and awkwardly drawn," "oppressive and unreasonable," and "discriminatory and confiscatory." 186 Kan. at 683, 686, 352 P.2d 58. Furthermore, the law "place[d] arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business" and was "designed to be so oppressive and unreasonable that it prohibit[ed] the conduct of such lawful business." 186 Kan. at 686, 352 P.2d 58.
The consistency of these judicial concepts across time is remarkable and unassailable. Perhaps the most influential Kansan to espouse the structural principles of the Declaration and section 1 was Kansas Supreme Court Justice-and later United States Supreme Court Justice-David Brewer.
10. Justice David Brewer: Defending Republican Self-Government
Justice Brewer came from a solidly abolitionist New England family of " 'old stock.' "
*545 Brodhead, David J. Brewer: The Life of a Supreme Court Justice, 1837-1910, at 1 (1994). His father, Josiah, edited antislavery periodicals. Brodhead, at 3. While studying law, Justice Brewer began to consider the Kansas struggle as emblematic of the national crisis over slavery. He inveighed against the Kansas-Nebraska Act and the administration of President Franklin Pierce. He wrote that " 'the crackling flames which rose from burning Lawrence and the pillar of fire and cloud of smoke that have rested on the plains of that lovely Territory [must] be the everlasting witness' to the 'failure and curse' of Pierce's administration." Brodhead, at 5.
After graduating, in September 1859, mere months after the Wyandotte Convention, the young lawyer relocated to Kansas to join the free-state movement. He arrived in Leavenworth with 65 cents in his pocket and a head full of ideas about the future of republican self-government. Brodhead, at 7. Ideas inspired by the Declaration of Independence, the Lincoln-Douglas debates, and the constituting of his adopted home state of Kansas. Ideas which he would spend a lifetime espousing as a political philosopher; evangelizing for as a public speaker; and enforcing as a jurist on the supreme courts of Kansas, which he joined in 1871, and of the United States, which he joined in 1889.
Curiously, the majority credits Justice Brewer with the idea that section 1 provided the people with enforceable "individual rights." Op at. 476-77. But Justice Brewer never espoused the majority's view that section 1 provides fundamental rights to limit an otherwise absolute legislative power. On the contrary, he enunciated a theory of delegated powers and retained pre-political sovereignty, echoing the likes of Justice Chase. During his tenure on the Kansas Supreme Court, Justice Brewer was the most consistent and insistent defender of the Declaration's principles of republican self-government, as set forth in sections 1 and 2 of the Kansas Constitution Bill of Rights. For example, in an early forceful dissent challenging legislation that fueled the growing railroad power, Justice Brewer asked: "[U]pon what, let me inquire, must such legislative action rest for support?" The State ex rel. St. Joseph & D.C.R. Co. v. Nemaha County , 7 Kan. 542, 554 (1871) (Brewer, J., dissenting). His answer:
"All power resides with the people. The ultimate sovereignty is with them. The constitution is the instrument by which some portion of that power is granted to different departments of the government. Power is not inherent in the government, from which some portion is withdrawn by the constitution. The object of the constitution of a free government is to grant, not to withdraw, power. This is the primal distinction between the constitutions of the old monarchical governments of Europe, and those of this country. The former indicate the amount of power which the people have been enabled to withdraw from the government; ours the amount of power the people have granted to the government.... The constitution creates legislature, courts, and executive. It defines their limits, grants their powers. It should always be construed as a grant. The habit of regarding the legislature as inherently omnipotent , and looking to see what express restrictions the constitution has placed upon its action, is dangerous, and tends to error." 7 Kan. at 554-55 (Brewer, J., dissenting).
For Justice Brewer, sections 1 and 2 of the Kansas Constitution Bill of Rights planted Kansas firmly in this fertile social compact soil. He declared these provisions were not a bunch of " 'glittering generalities' "; instead, they imposed the "conditions upon which legislative power is granted" and through which the exercise of such power must be vetted. 7 Kan. at 555-56 (Brewer, J., dissenting); see Atchison Street Rly. Co. v. Mo. Pac. Rly. Co. , 31 Kan. 660, Syl. ¶ 1, 3 P. 284 (1884) ("The bill of rights is something more than a mere collection of glittering generalities: ... all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm.").
" '[A]s expressed in the Bill of Rights, "all political power is inherent in the people." In extended communities, for obvious reasons, the direct exercise of this power becomes impracticable, and this has led to an *546 institution of a subordinate agency called the government, entrusted for the time being with the exercise of such sovereign power, and such only, as is clearly expressed in the instrument of delegation-the constitution.... Hence this court has held that it is always legitimate to insist that a legislative enactment, drawn in question, is invalid, either because it does not fall within the general grant of power to that body, or because it is prohibited by some provision of the constitution: and if the former is made to appear, it is as clearly void as though expressly prohibited.' " Nemaha , 7 Kan. at 556-57 (Brewer, J., dissenting) (quoting Cass v. Dillon , 2 Ohio St. 607, 628 [1853] [Ranney, J., dissenting] ).
For Justice Brewer, sections 1 and 2, drawn as they were in the language of the Declaration, imposed a structural limitation on the "general grant of power" that had been "entrusted for the time being" to the state. Special interest legislation "whose apparent object and manifest result is to add wealth to the few by taking it from the many, or to give by law to one man that which another has gained by labor" fell outside that grant of power. 7 Kan. at 556 (Brewer, J., dissenting).
In other words, Justice Brewer understood sections 1 and 2 as announcing a Madisonian charter of limited power granted by liberty. All pre-political power belongs to the people; they grant some of this power to the government for the security and furtherance of the common good; and the government cannot act outside this granted power. Thus, courts must inspect legislation to prevent arbitrary, irrational, and discriminatory acts that are not reasonably related to the common welfare. Otherwise, the state becomes "inherently omnipotent" to create or deny rights as it sees fit. 7 Kan. at 555 (Brewer, J., dissenting); see Fong Yue Ting v. United States , 149 U.S. 698, 737, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (Brewer, J., dissenting) ("This doctrine of powers inherent in sovereignty is one both indefinite and dangerous. Where are the limits to such powers to be found, and by whom are they to be pronounced? ... The governments of other nations have elastic powers-ours is fixed and bounded by a written constitution.").
Because ours is a charter of limited power granted by liberty, Brewer's question (echoing Washington and Justice Chase before him) was " '[w ]hat have [the people] authorized to be done ?' " Nemaha , 7 Kan. at 557 (Brewer, J., dissenting). Justice Brewer began exploring this question on the Kansas Supreme Court and would continue to do so the rest of his career. The basic answer to Justice Brewer's question was this: the people have authorized the State to take any reasonable measure which promotes the common good. Arbitrary, irrational, or discriminatory regulations, however, have not been authorized.
So, by way of example, in Intoxicating-Liquor Cases , 25 Kan. 751 (1881), Justice Brewer, writing for the court, construed a ban on intoxicating liquor narrowly, holding it prohibited the use of such liquor as a beverage but not for medicinal, culinary, or sanitary purposes. But he also commented that a broad construction of the statute-one that would prohibit the use of all intoxicating liquors without reasonable exceptions-would violate the guarantees of section 1 :
"[T]he writer of this opinion does not hesitate to say that such a construction, if imperatively demanded by the language used, would carry the statute beyond the power of the legislature. I do not think the legislature can prohibit the sale or use of any article whose sale or use involves no danger to the general public. The habits, the occupation, the food, the drink, the life of the individual, are matters of his own choice and determination, and can be abridged or changed by the majority speaking through the legislature only when the public safety, the public health, or the public protection requires it. I do not think the legislature has the power to prohibit the raising or sale of corn, though out of it whisky may be obtained. No more do I believe that the legislature has the power to prohibit the sale of cologne, though alcohol be in it. The constitutional guaranty of 'life, liberty, and the pursuit of happiness,' is not limited by the temporary caprice of a present majority, and can be limited only *547 by the absolute necessities of the public." 25 Kan. at 765-66.
I could be wrong, but I doubt even my colleagues in the majority could find in section 1 a "fundamental right" to sell cologne. So why does Brewer mention it as an activity section 1 may protect? Because Brewer understood that section 1 has never been about "fundamental rights."
Justice Brewer may have been influenced by his uncle, United States Supreme Court Justice Stephen Field, who authored the influential dissent in the Court's Slaughterhouse cases. Slaughter-House Cases , 83 U.S. (16 Wall.) 36, 83-111, 21 L.Ed. 394 (1872) (Field, J., dissenting). There, the Supreme Court upheld Louisiana's grant of a monopoly to one slaughterhouse corporation. 83 U.S. at 83. The question raised by the Slaughter-House Cases was whether the Fourteenth Amendment-and the Privileges and Immunities Clause in particular-imposed any limits on a state's exercise of its police powers. In dissent, Justice Field wrote:
"It is contended in justification for the act in question that it was adopted in the interest of the city, to promote its cleanliness and protect its health, and was the legitimate exercise of what is termed the police power of the State. That power undoubtedly extends to all regulations affecting the health, good order, morals, peace, and safety of society, and is exercised on a great variety of subjects, and in almost numberless ways.... But under the pretence of prescribing a police regulation the State cannot be permitted to encroach upon any of the just rights of the citizen, which the Constitution intended to secure against abridgment." 83 U.S. at 87 (Field, J., dissenting).
But what, precisely, were those "just rights" described as the "privileges and immunities" of the American citizen? To find an answer, Justice Field looked to a famous passage in Corfield v. Coryell , 6 F. Cas. 546, 551-52 (C.C.E.D. Pa. 1823), authored by George Washington's nephew, Justice Bushrod Washington. In Corfield, Justice Washington considered the privileges and immunities to which "[t]he Citizens of each State shall be entitled" under U.S. Const. art. IV, § 2, cl. 1, concluding that they could all be
"comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole." 6 F. Cas. at 551-52.
"This appears to me," said Justice Field, "to be a sound construction of the clause in question." Slaughter-House Cases , 83 U.S. at 97 (Field, J., dissenting). I doubt the similarity of this language to the language of section 1-as a structural limitation on the police power of the state-was lost on Justice Brewer.
Familial speculation aside, Justice Brewer arrived at the United States Supreme Court on the heels of the Court's decision in Yick Wo v. Hopkins , 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), a watershed police power case that overturned an ordinance that discriminated against Chinese nationals by excluding them from the laundromat business in San Francisco. Yick Wo made clear this arbitrary law-which gave a local board unfettered power to decide the fate of Chinese-owned laundromats-not only violated the Fourteenth Amendment but also undermined the foundation of government itself. As the Court explained, the people did not authorize the government to use "purely personal and arbitrary power":
"When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and *548 limitation of power." 118 U.S. at 369-70, 6 S.Ct. 1064.
The Court also analogized the laundromat law to slavery because it deprived Chinese nationals of "the means of living ... at the mere will of another," citing the Declaration's guarantees of "life, liberty, and the pursuit of happiness" in support. 118 U.S. at 370, 6 S.Ct. 1064. Thus, a government of delegated powers has no authority to sabotage the lawful business of a disfavored group. See Brewer, The Liberty of Each Individual, Address at H.C. Bowen's residence, Roseland Park, (July 4, 1893), in N.Y. Times, Mr. Bowen's Celebration: Judge Brewer's Plea for Individual-Liberty as Against Combinations (July 5, 1893) (warning about the " 'growing disposition to sacrifice the individual to the mass, to make the liberty of the one something which may be ruthlessly trampled into the dust because of some supposed benefit to the many' ").
During his time on the Court, Justice Brewer relied on Yick Wo to advance a rights-first theory of government, using language from the Declaration of Independence to describe the boundary of the police power. For example, in Gulf, Colorado & Santa Fe R'y v. Ellis , 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1897), the Court considered whether a law imposing a special penalty on railroad companies for failing to pay certain debts violated the police power. The problem was that "[t]he act single[d] out a certain class of debtors and punishe[d] them when, for like delinquencies, it punishe[d] no others," not even other types of corporations. 165 U.S. at 153, 157, 17 S.Ct. 255. The Court simply asked, why was this industry singled out for a special penalty? The answer: for no good reason.
Justice Brewer, writing for the majority, debunked the myth that the penalty would protect the public from the "peculiarly dangerous nature" of railroad corporations. 165 U.S. at 158, 17 S.Ct. 255. He conceded that a law requiring railroad tracks to be fenced, for example, would be a reasonable exercise of the police power to promote the public safety. But, he explained, "[t]he hazardous business of railroading carries with it no special necessity for the prompt payment of debts." 165 U.S. at 158, 17 S.Ct. 255. Indeed, the Court recognized that the public safety rationale was a red herring and held the statute was enacted to arbitrarily punish railroad corporations. 165 U.S. at 159, 17 S.Ct. 255. Justice Brewer used Yick Wo and the Declaration to drive the point home that arbitrary laws are beyond the scope of the police power:
"But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this. No language is more worthy of frequent and thoughtful consideration than these words of Mr. Justice Matthews, speaking for this court, in Yick Wo v. Hopkins , 118 U.S. 356, 369 [6 S.Ct. 1064] : 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' The first official action of this nation declared the foundation of government in these words: 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.' While such declaration of principles may not have the force of organic law, or be made the basis of judicial decision as to the limits of right and duty, ... yet the latter is but the body and the letter of which the former is the thought and the spirit, and it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government." 165 U.S. at 159-60, 17 S.Ct. 255.
Of course, the language of the Declaration does not carry "the force of organic law" in the federal Constitution as it does in Kansas. But in determining the original public meaning of section 1, it is compelling that Justice *549 Brewer-who championed section 1 of the Kansas Constitution Bill of Rights as an enforceable restriction on the police power-also invoked the same language of the Declaration to check the police power at the federal level. See Budd v. New York , 143 U.S. 517, 550, 12 S.Ct. 468, 36 L.Ed. 247 (1892) (Brewer, J., dissenting) (invoking the "unalienable rights" of " 'life, liberty and the pursuit of happiness' " to argue that a grain storage price-fixing law violated the police power). And it is also compelling that the Supreme Court adopted a delegated powers theory of government to guide its police power inquiry. See Cotting v. Kansas City Stock Yards Co., etc. , 183 U.S. 79, 84, 22 S.Ct. 30, 46 L.Ed. 92 (1901) (following Yick Wo 's theory of government to reign in the police power: "It has been wisely and aptly said that this is a government of laws and not of men; that there is no arbitrary power located in any individual or body of individuals; but that all in authority are guided and limited by those provisions which the people have, through the organic law, declared shall be the measure and scope of all control exercised over them."). Indeed, the Court's delegated powers approach in Yick Wo and its progeny bears a striking resemblance to Justice Brewer's dissent in Nemaha .
In Gulf , Justice Brewer also set forth a police power test that finds kinship in Kansas caselaw: "[I]n all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground-some difference which bears a just and proper relation to the attempted classification-and is not a mere arbitrary selection." 165 U.S. at 165-66, 17 S.Ct. 255. Indeed, Justice Brewer exhorted courts to guard against even one step outside the bounds of the police power, insisting, " '[i]t is the duty of courts to be watchful for the constitutional rights of the citizens[,] and against any stealthy encroachments thereon. Their motto should be obsta principiis [withstand beginnings].' " 165 U.S. at 154, 17 S.Ct. 255 (quoting Boyd v. United States , 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 [1886] ); Fong Yue Ting , 149 U.S. at 744, 13 S.Ct. 1016 (Brewer, J., dissenting).
Justice Brewer later carried this warning from the bench to the podium. In a series of speeches, he cautioned that left unchecked, the police power would grow "until it threatens to become an omniverous governmental mouth, swallowing individual rights and immunities." Brewer, U.S. Sup. Ct. Justice, Address to the Virginia State Bar Association: Two Periods in the History of the Supreme Court 23 (August 1906); see Brewer, U.S. Sup. Ct. Justice, Address to the Kansas Bar Association: Some Thoughts about Kansas (January 16, 1895), in Twelfth Annual Meeting of the Bar Association of the State of Kansas 61, 68-69 (1895) (hereinafter Thoughts ) ("It seems often as though the function of the policeman was not that of protection against crime, but that of regulation and watch over the daily life of each individual."). He described the police power as "that power by which the State provides for the public health, and the public morals, and promotes the general welfare" but has tragically become "the refuge of timid judges to escape the obligations of denouncing a wrong, in a case in which some supposed general and public good is the object of legislation." Brewer, U.S. Sup. Ct. Justice, Address to the Graduating Class at Yale Law School: Protection of Private Property from Public Attack (June 23, 1891) 10 (Hoggson and Robinson eds., 1891).
Justice Brewer even indulged a willingness to apply the principle of participatory consent outside strictly jurisprudential pursuits. Speaking to the Kansas Bar Association in 1895, Brewer warned that even private interests-the accumulation of capital into "combinations"-can exercise arbitrary power over people's lives. Thoughts , at 69. Brewer's warning came at a period of great unrest in Kansas, during the populist resistance to economic control by far-away, mostly out-of-state forces over the lives of ordinary Kansans (farmers in particular). "Has Kansas fulfilled her mission? Has her intense enthusiasm for liberty spent its force?" he rhetorically asked. Thoughts , at 67. He worried that even in the private sphere, liberty was threatened:
"The corporation is not content to carry on its work without interfering with that of the individual, but it aims by virtue of its *550 accumulated power to destroy all competition and monopolize the entire business. The voice of the combination and trust to the individual is, 'Be swallowed up and live, or fight and die.' " Thoughts , at 69.
Thus, Justice Brewer sympathized with the "[h]elpless" laborer who, "in a contest with such accumulated power," organizes seeking "to maintain his rights against the combination of capital." Thoughts , at 69. But in this struggle, Justice Brewer lamented, the organization itself "becomes equally despotic over the individual laborer" determining "when he shall work and when not, the wages he must receive, and the various other conditions of employment." Thoughts , at 69. Given this, "[n]ever has there been a time when the inspiring thought written into the Declaration of Independence, of inalienable rights, rights which each individual has to life, liberty, and the pursuit of happiness, was in greater peril than at the present moment."Thoughts , at 67.
These ideas also echo through disciplines besides law. For example, explaining his objection to what Brewer called the "combination" of capital, the economic theorist Karl Polanyi clarified: "It is not degrading to work under orders: any collective work requires its coordination through orders." Polanyi et al., Economy and Society: Selected Writings 17 (2018). Instead, "[w]hat is degrading is the fact that under the given conditions the power to command, to which the workers are subjected, is an alien power, although it should be the workers' own since, from the social point of view, it rests on ... their own labour...." Polanyi, at 17.
The question, to appropriate Polanyi's felicitous phrasing, is whether, "under the given conditions," the "power to command ... is an alien power" or is the people's own power, delegated by consent. That is the crucial distinction, and it makes all the difference. It doesn't matter how many "rights" an alien power confers upon those under its dominion; the degradation is the same. Treating human beings as mere profit and choice maximizing machines disembeds them from the political community itself, rendering the "power to command" an "alien" rule. This "un-freedom"-as Polanyi termed it-stands in the "voluntarist" tradition described above. And there is a stark contrast between the voluntarist unfreedom and the true liberty that flourishes under the conditions of just rule, based on participatory consent for the promotion and security of the commonwealth.
Either section 1 is a fount of judicially discovered and preferred "fundamental" rights or it is a blanket guarantee to all Kansans of the first rights of republican self-government: the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to the common welfare, on the other. Section 1 cannot be both. The former road alienates the people from the exercise of power and disembeds them from the political community. But this is the way the majority has decided to go.
11. Rational Basis with Bite
If section 1 does not protect "fundamental" rights with the shield of "strict scrutiny" judicial review, is it necessarily a mere paper law-a glittering generality? No. Contrary to modern notions of "rational basis" review, the judicial inquiry demanded by section 1 would look to the actual legislative record rather than to hypothetical reasons or any possible imagined rationale. The test has occasionally been described as "rational basis with bite." Note, Rational Basis With Bite: Intermediate Scrutiny by Any Other Name , 62 Ind. L.J. 779, 779-80 (1987) (coining the phrase).
As one judge recently put it, "this test is rational basis with bite, demanding actual rationality , scrutinizing the law's actual basis , and applying an actual test ." Patel v. Dept. of Licensing and Regulation , 469 S.W.3d 69, 98 (Tex. 2015) (Willett, J., concurring). On the one hand, it does not load "the dice-relentlessly-in government's favor," resulting in a "pass/fail" test that the "government never fails." 469 S.W.3d at 99 (Willett, J., concurring). On the other hand, it remains a deferential test-one that recognizes our Constitution vests the legislative branch of government with the institutional *551 competence to consider competing interests and policy options, resulting in democratic judgment about the common welfare of all Kansans.
In sum, section 1 demands this "rational basis with bite" judicial inquiry. In order to be a constitutional exercise of power, every act of our Legislature must be rationally related to the furtherance or protection of the commonwealth. The lodestar of this test is, " 'what have [the people] authorized to be done ?' " Nemaha , 7 Kan. at 557 (Brewer, J., dissenting). The people have not authorized the State to act in arbitrary, irrational, or discriminatory ways. Applying the necessary deference, a court must examine the actual legislative record to determine the real purpose behind any law in question before it can conclude the law is within the limited constitutional grant of power possessed by the State.
Again, Justice Brewer provides guidance. "While good faith and a knowledge of existing conditions on the part of a legislature is to be presumed," courts reviewing an exercise of police power should never "carry that presumption to the extent of always holding that there must be some undisclosed and unknown reason for subjecting certain individuals or corporations to hostile and discriminating legislation" because to do so would "make the protecting clauses ... a mere rope of sand, in no manner restraining state action." Gulf , 165 U.S. at 154, 17 S.Ct. 255.
Here I pause to observe that the majority's characterization of the judicial test I have set forth-the test section 1 demands every exercise of the State's police powers must satisfy-bears no resemblance to anything I have written here. The majority claims I am "dismissive" of the rights of citizens. Op. at 478-88. The majority reads the limitations on the State's police power I describe as setting "too low a bar" and "allowing the State to ... intrude into all decisions about childbearing" and "our families." Op. at 497-98. The original public meaning of section 1 is described as leaving citizens "naked and defenseless" against abusive state power. Op. at 501-02. The majority suggests my approach grants "unrestrained" power to the State, "unfettered by constitutional constraints," which has "no practical limits" and allows the government to "intrude with impunity" against the individual. Op. at 502-03. And finally, with an Atwoodian flourish, I stand accused of maintaining "that upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination of what is in the common good." Op. at 486-87. All of which leads to the preposterous "presumption" that I would find "no constitutional conflicts" with state-mandated mass sterilization. See op. at 502-03 (describing a hypothetical law where all males are forcibly sterilized at the age of 18 in order to limit population density). Meanwhile, continuing the theme, the concurring opinion suggests I am "perfectly align[ed]" with the infamous Holmesian judgment that " '[t]hree generations of imbeciles are enough.' " Op. at 512-13 (Biles, J., concurring).
I am agog. I must know-what have my colleagues been reading? It cannot be anything I have written. In any case, I assure the reader this description of my view is a fabrication so flimsy it makes run-of-the-mill straw men appear as fairy tale knights by comparison.
IS S.B. 95 A LEGITIMATE EXERCISE OF POLICE POWER ?
So, is S.B. 95 a legitimate exercise of state police power? If the original meaning of section 1-and this court's prior mode of consistently applying section 1 as a police power provision-had carried the day here, I would be content to wait to answer that question. In the meantime, I would remand this case to the district court to apply the correct legal standard. See, e.g., State v. Garcia , 295 Kan. 53, 54, 283 P.3d 165 (2012) (reversing and remanding to ensure the district court applied the correct legal standard). On remand, the question for the parties to litigate, and the district court to resolve, would be whether S.B. 95 bears a reasonable relationship to the common welfare or is otherwise arbitrary, irrational, or discriminatory.
Unfortunately, history, reason, and original meaning have not carried the day. Hence, because the proper "rational basis with bite"
*552 test will otherwise go unapplied in today's context, I offer some thoughts on the general considerations a court might entertain if such a test was applied, with the caveat that sufficient facts have not been developed in the record to arrive at any definitive conclusions.
The overriding question is whether the legislative act is reasonably related to the furtherance or protection of the common welfare. The Legislature has wide latitude to define for itself the substantive content of the common good, circumscribed by the traditional police power limit that a law cannot be arbitrary, irrational, or involve a class-based form of discrimination. Of course, protecting unborn life and requiring humane abortion procedures when that life is taken can promote the common good. Even the Supreme Court has recognized the state's so-called "life interest." See Gonzales , 550 U.S. at 157-58, 127 S.Ct. 1610 (affirming the government's valid objectives in "protecting the life of the fetus," showing "profound respect for the life within the woman," and " 'protecting the integrity and ethics of the medical profession' ").
The stated goal of S.B. 95 is to protect Kansas unborn children from dismemberment abortion, or being "cut" "one piece at a time from the uterus." K.S.A. 65-6742(b)(1) ; K.S.A. 65-6741. It is certainly reasonable to say the State could have a valid purpose in banning this brutal method of killing an unborn child. See Stenberg , 530 U.S. at 961, 120 S.Ct. 2597 (Kennedy, J., dissenting) ("States also have an interest in forbidding medical procedures which, in the State's reasonable determination, might cause the medical profession or society as a whole to become insensitive, even disdainful, to life, including life in the human fetus."); 530 U.S. at 953, 120 S.Ct. 2597 (Scalia, J., dissenting) ("The method of killing a human child ... proscribed by this statute is so horrible that the most clinical description of it evokes a shudder of revulsion."). Shockingly, the majority hardly even considers the State's legitimate interest in protecting unborn life as a means of promoting and furthering the common welfare of our state.
This failure is glaring when contrasted with the State of Kansas' longstanding policy of protecting the unborn-even outside the abortion context. For instance, Kansas criminalizes homicides of the unborn; refuses to execute pregnant convicts; permits wrongful death actions for the unborn; gives no effect to a living will when the patient is pregnant; and provides for the representation of the unborn in trust and probate proceedings. See K.S.A. 2018 Supp. 21-5419(c) (homicides of unborn children); K.S.A. 22-4009 (prohibition against execution of a pregnant convict); K.S.A. 2018 Supp. 60-1901(b) (action for wrongful death of unborn child); K.S.A. 65-28,103 (living will has no effect during pregnancy); K.S.A. 59-2205 (representation of unborn in a probate proceeding); K.S.A. 59-2254 (representation of unborn in a trust accounting); K.S.A. 58a-305 (appointment of representative for unborn individual under Kansas Uniform Trust Code).
If, however, the legislative record reveals evidence of a discriminatory intent or some other arbitrary or irrational purpose behind the law, a court must actively consider the possibility that the act was not actually intended to further the common welfare and legitimate state interest in unborn life and humane medical practices. But such considerations are neither possible nor appropriate at this stage of litigation, where a preliminary injunction has been granted, and in the context of a dissenting opinion. This brief recitation is sufficient to limn the outlines of the kind of judicial review that the original public meaning of section 1 requires and our predecessors actually performed many times.
LOSING OUR COMMONWEALTH
Many Kansans-a significant majority of them if one extrapolates from the votes of their political representatives-will feel aggrieved by the decision this court renders today. They will not be pacified by claims that the result was achieved by a fair, impartial, and "democratic vote by [seven] lawyers." Stenberg , 530 U.S. at 955, 120 S.Ct. 2597 (Scalia, J., dissenting). It's important to ask, why? Is it because, as the majority suggests, a significant majority of Kansans continue to be informed by centuries-old prejudices? Given the flourishing and broadly equal society Kansans have fashioned, this *553 explanation seems unlikely at best. Or is it because Kansans will feel, even if only intuitively, that an important right of self-government has been stolen away from them under a cloud of impenetrable legal jargon?
As explained at length above, section 1-properly understood-expresses a truth widely known and accepted at the time of Kansas' constitutional moment: pre-political individual sovereigns possess a natural and inalienable right to do "what they like." Convention, at 185. But that was only half the story. Just as important, Kansans understood the Declaration's language anticipated that such pre-political people desired to be more-they desired to be citizens. Such people came together and formed political communities by relinquishing however much of that individual sovereignty was necessary to obtain a "state"-that is, a common welfare secured for all.
Thus, the newly constituted State of Kansas exercised limited police power in the name of the pre-constitutional person who, by his or her implied consent, had agreed to be bound to police regulations so long as they were not irrational, arbitrary, or discriminatory, and were reasonably related to the furtherance of the common welfare. At our founding, Kansans understood the "old truth" embodied in section 1 to mean that every person would give up "enough control over his original rights to permit government to maintain an organized, stable, peaceful pattern of human relations." Rossiter, Seedtime of the Republic: The Origin of the American Tradition of Political Liberty 442 (1953).
Kansans were just as interested in achieving an organized, stable, peaceful commonwealth as they were in retaining individual sovereignty. The liberty proclaimed in both the Declaration and in section 1 was not just the negative liberty of the pre-political individual, but also the " 'positive liberty' " of newly created "citizens of a self-governing society to participate and act for the public good and to use their government to seek, in Aristotle's words, 'not merely life alone, but the good life.' " Ketcham, Framed For Posterity: The Enduring Philosophy of the Constitution 40 (McWilliams & Banning eds., 1993).
It is the right to self-government properly understood-and the constituent political community it establishes-which today's majority has taken from Kansans. Put another way, the "practice of constitutional revision by an unelected committee of [seven], always accompanied (as it is today) by extravagant praise of liberty, robs the People of the most important liberty they asserted in the Declaration of Independence and won in the Revolution of 1776: the freedom to govern themselves." Obergefell v. Hodges , 576 U.S. ----, 135 S.Ct. 2584, 2627, 192 L.Ed.2d 609 (2015) (Scalia, J., dissenting). Likewise, if " 'the people ... should ever think of making judges supreme arbiters in political controversies ... they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way-slowly, but surely-a new sovereign power in the republic....' " In re Gunn, Petitioner , 50 Kan. 155, 229, 32 P. 948 (1893) (Allen, J., dissenting) (quoting Luther v. Borden et al. , 48 U.S. (7 How.) 1, 52-53, 12 L.Ed. 581 [1849] [Woodbury, J., dissenting] ); see Janus v. State, County, and Municipal Employees, 585 U.S. ----, 138 S.Ct. 2448, 2502, 201 L.Ed.2d 924 (2018) (Kagan, J., dissenting) (warning about "black-robed rulers overriding citizens' choices").
As one dissenting Tennessee Supreme Court Justice explained, calling abortion a fundamental right denies the people the opportunity to rule themselves and weigh difficult competing interests:
"Undoubtedly, the issue of abortion is one of the most controversial and fiercely debated political issues of our time, and any resolution of this issue can only be achieved through deliberative, thoughtful, and public dialogue. Nevertheless, with its decision today, the Court has elevated one extreme of this debate to a constitutional level and has made any meaningful compromise on this issue all but impossible. The Court has done so simply by proclaiming that the right to obtain an abortion is 'fundamental' under the Tennessee Constitution, and that as such, our Constitution effectively removes from the General Assembly any power to reach a reasonable *554 compromise that considers all of the important interests involved." Planned Parenthood v. Sundquist , 38 S.W.3d 1, 25 (Tenn. 2000) (Barker, J., dissenting in part and concurring in part).
Long ago, in Federalist 71, Alexander Hamilton described the importance of this kind of thoughtful, public resolution of difficult and fiercely debated issues. He wrote that the "republican principle demands that the deliberate sense of the community should govern the conduct of those to whom they intrust the management of their affairs...." Hamilton, The Federalist No. 71, The Same View Continued in Regard to the Duration of the Office , in Madison, Hamilton, and Jay, The Federalist Papers 409 (Kramnick ed., 1987). "In the particular type of deliberative democracy fashioned by the American framers, the citizenry would reason, or deliberate, through their representatives...." Bessette, The Mild Voice of Reason: Deliberative Democracy & American National Government 1 (1994). The framers conceived the republican "political process as an effort to select and implement public values. The process is primarily one of collective self-determination [in which] ... [t]he role of the representative ... is not to choose among preselected values but instead to select values through public deliberation and debate." Sunstein, Naked Preferences and the Constitution , 84 Colum. L. Rev. 1689, 1694-95 (1984).
The first Kansans understood the language of section 1 not only as an inherent limitation on the police power of the state, but also as legitimizing the political community itself, along with its "deliberative sense" of how to further the common welfare of all Kansans. "Kansas" was the community being "constituted" after all. See, e.g., Topeka Const. of 1855, Preamble ("[I]n order to secure to ourselves and our posterity the enjoyment of all the rights of life, liberty and property, and the free pursuit of happiness, do mutually agree with each other, to form ourselves into a free and independent State....").
This deliberative sense is the only thing legitimizing law itself. "Law is more than just another opinion.... Law is the principal institution through which a society can assert its values." Bickel, The Morality of Consent 5 (1975). The people's deliberative sense, when confined to the pursuit of the common welfare, creates a pragmatic and flexible counterweight to the absolute sovereignty of the Lockean pre-constitutional person. As one scholar put it, "eighteenth century values of natural rights never totally supplanted the seventeenth century American belief in a community held together by substantive values reflected in moral legislation." Forte, 13 Ga. L. Rev. at 1507.
Such balance is the hallmark of our historic understanding of what makes a republican form of government. When pursued unilaterally, each version of "liberty" had proven inherently unstable. But when placed in creative equipoise, the two traditions achieved their most lasting expression in the Declaration and the explosion of republican governments it spawned. Thus, the natural rights theorists that so influenced the American founding "emphasized both individual rights and the common good as complementary rather than conflicting aspects of the human condition." Tierney, at 334.
A more down-to-earth way to say the same thing-the Constitution announces and defines boundaries, not values. Or, if one must use the language and discourse of values, one might say those boundaries are the values the Constitution announces. And it is the courts' job to patrol boundaries, not to decide whether any particular enactment is consistent with "fundamental" or "substantive" values. See op. at 466-67, 498-99. One of the most cogent and penetrating critics of the judicial pursuit of fundamental constitutional values was the longtime Harvard legal philosopher and constitutional theorist John Hart Ely.
Ely was no originalist, and he supported legal abortion access as a matter of policy. He took the view that "certain of our Constitution's critical phrases cannot intelligibly be given shape without a substantial injection of content from some source beyond the documentary language." Ely, Foreword: On Discovering Fundamental Values , 92 Harv. L. Rev. 5, 5 (1978). But this cannot mean "that all bets are off" and judges are "free to make the Constitution mean whatever [they] please." 92 Harv. L. Rev. at 5. As Ely explained, the "jurisprudence that defines the *555 Court's role as one of protecting those values the Court regards as truly fundamental" began in earnest with Roe v. Wade , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). 92 Harv. L. Rev. at 15. Such a jurisprudence conceives of the role of appellate judges as "identifying and enforcing upon the political branches those values that are, according to one formula or another, truly important or fundamental" because "the political process [cannot] be trusted with such judgments." 92 Harv. L. Rev. at 10, 12. Specifically, "the democratic process is incapable of dealing responsibly with the excruciating clash of values abortion entails." 92 Harv. L. Rev. at 11. Thus, "a woman's right to choose an abortion is simply so important, so fundamental, that we cannot permit it to be legislatively inhibited." 92 Harv. L. Rev. at 11.
Today's majority certainly follows this well-trod rationale. And in truth, many people have grown accustomed to thinking about the American judiciary in precisely this fashion. The idea is buttressed by "the prevailing academic line ... that the Court should give content to the Constitution's open-ended provisions by identifying and enforcing upon the political branches America's fundamental values." 92 Harv. L. Rev. at 15. The glaring problem, as Ely devastatingly describes, is that when judges are engaged in this process of values discovery, what the judge is "likely really to be 'discovering,' whether or not he is fully aware of it, are his own values." 92 Harv. L. Rev. at 16. And in that process of self-discovery, there "will be a systematic bias in judicial choice of fundamental values, unsurprisingly in favor of the values of the upper middle, professional class from which most lawyers and judges ... are drawn." 92 Harv. L. Rev. at 37. This undeniable truth seems "so flagrantly elitist and undemocratic it should be dismissed forthwith." 92 Harv. L. Rev. at 38. Ely concludes with Robert Dahl's wry observation that " 'almost the only people who seem to be convinced of the advantages of being ruled by philosopher-kings are ... a few philosophers.' " 92 Harv. L. Rev. at 39 (quoting Dahl, Democracy in the United States 24 [3d ed. 1967] ). And by way of addendum one might add-a majority of Kansas Supreme Court justices.
So how should we understand the proper role of judges in our republican system of government? Ely again supplies a useful metaphor: "The approach to constitutional adjudication recommended here is akin to what might be called an 'antitrust' as opposed to a 'regulatory' orientation to economic affairs-rather than dictate substantive results it intervenes only when the 'market,' in our case the political market, is systematically malfunctioning." Ely, Democracy and Distrust: A Theory of Judicial Review 102-03 (1980). Just so. While I have set forth a more originalist understanding of the proper constitutional boundaries imposed on the exercise of state power by the Kansas Constitution, and Ely preferred an approach grounded more in notions of procedural participation and fairness, the end results are not too far apart.
Both Ely and I fall on the side of judges as "keeper[s] of the covenant" instead of "Platonic guardians." Pacelle Jr. et al., Keepers of the Covenant or Platonic Guardians? Decision Making on the U.S. Supreme Court , 35 American Politics Research 718 (2007); see also Plyler v. Doe , 457 U.S. 202, 242, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (Burger, C.J., dissenting) ("The Constitution does not constitute us as 'Platonic Guardians' nor does it vest in this Court the authority to strike down laws because they do not meet our standards of desirable social policy, 'wisdom,' or 'common sense.' "). It is the judicial maintenance of this constitutional synthesis-between boundaries that may not be crossed by the state for any reason, on the one hand, and a wide field to permissibly pursue the common good through the deliberative sense of the political community, on the other-that properly balances (and thus preserves) both the people's political liberty of self-government and their pre-political liberty "to do the nearest what they like-the nearest what they think and act." Convention, at 185.
Thus, among the casualties of today's decision is the deliberative sense of our particular political community-constituted in 1861 as "Kansas"-concerning what best serves the common welfare of its people. Without that deliberative sense, the ground under the political community erodes. Which is to say, the "constituting" of Kansas is itself effaced *556 and diminished. Our unity as a particular "people" is undermined. As one leading political philosopher of the 20th century put it, "[h]uman society is.... illuminated with meaning from within" through "an elaborate symbolism" by "the human beings who continuously create and bear it as the mode and condition of their self-realization." Voegelin, Representation and Existence, in 5 The Collected Works of Eric Voegelin 109 (2000).
Those symbols-in our case, the paramount symbol of the Declaration of Independence and section 1-are so important because they reveal "the internal structure" of the political community-"the relations between its members and groups of members." Voegelin, at 109. In simpler terms, constitutions both create and express the self-understanding of a particular political community. "[T]he members of a society experience" the "symbolization" inherent in constituting acts as "more than an accident or a convenience; they experience it as of their human essence." Voegelin, at 109.
The loss of this self-reflective, deliberative sense of ourselves is felt keenly by citizens who perceive, even if dimly, that something of their political "essence" is being eliminated. Practically speaking, "by foreclosing all democratic outlet for the deep passions this issue arouses, by banishing the issue from the political forum that gives all participants, even the losers, the satisfaction of a fair hearing and an honest fight," this court "merely prolongs and intensifies the anguish" felt by all sides of this existential argument. Casey , 505 U.S. at 1002, 112 S.Ct. 2791 (Scalia, J., dissenting).
Nothing in this suggests that the deliberative sense of the political community cannot or does not, from time to time, exceed its legitimate bounds. Of course it can, and often does. When it does, it is the role of the judicial branch to police the policeman, to curtail those abuses, to put the political community back inside its "constituted" bounds. When judges carry out this policing function by considering the deliberative sense of the political community on its own terms-that is, by considering its reasonable relationship to the common good-we affirm the legitimacy of the political community exercising its lawmaking function. This remains true even when determining the police power was exceeded in a particular instance. But today's majority eschews the more modest, restrained role of constitutional covenant keeper in favor of the unrestrained Platonic guardian of constitutional "values."
CONCLUSION
If any state has a historical claim to a seat of honor on any dais celebrating the triumph of the principles of the Declaration of Independence in the decades surrounding the Civil War, it is our beloved home of Kansas. More than any other state, ours was birthed in the crucible of pitched battle between two opposed and irreconcilable ideas-government by consent or consent by government .
Given the opportunity to seize this birthright anew, our court has decided-"all for the sake of political power," in Senator Sumner's words-to reach instead for the thin gruel of an all-powerful state restrained only by the caprice of judicially discovered "fundamental" rights. Sumner, 5. Section 1 was always intended to introduce a charter of limited power, not a charter of limited rights. As it turns out, there is an important difference between the two. Again, in Madison's striking words, it is the difference between "charters of power granted by liberty" and "charters of liberty ... granted by power." Madison, at 83.
We have turned our constitutional structure on its head. Instead of a general limit on the police power of the state which constrains every exercise of that power, section 1 is now a "guarantee" of limited, preferred rights granted by the arbitrary power of a majority of judges on this court. Of course, this leaves in place the equally dangerous arbitrary power of the Legislature to act with impunity in any area not already occupied by this court.
At the outset, I noted that this case isn't just about the policy of abortion, it is more basically about the structure of our government. While true, this description fails to account for a strange but persistent symbiosis between the two. Abortion has become the judicially preferred policy tail wagging the structure of government dog. For the majority, *557 the settled and carefully calibrated republican structure of our government must give way, at every turn, to the favored policy. But in my considered judgment, constitutional structure is the very thing securing and guaranteeing the full range of human liberty. History and reason suggest that those who, in the name of liberty, tear down that edifice will wind up out in the political elements, unsheltered and exposed to the cold wind of every arbitrary power.
I dissent.